**Lloyd HOPE and Constance Fennell, individually and as parents and lawful guardians of Moyo Hope, a minor, and Moyo Hope, Plaintiffs,**

v.

**Ramon CORTINES, individually and as Chancellor of the Board of Education of the City of New York and Board of Education of the City of New York, Defendants.**

No. 94–CV–4515 (FB).

United States District Court, E.D. New York.

Jan. 5, 1995.

Loren Baily, Brooklyn, NY, for plaintiffs.

Paul A. Crotty, Corp. Counsel, City of New York (Mae Ng, and Norma Kerlin, of counsel) New York City, for defendants.

*MEMORANDUM AND ORDER*

BLOCK, District Judge:

Plaintiffs Lloyd Hope and Constance Fennell, the parents of plaintiff Moyo Hope ("Moyo"), a 14 year-old minor, brought this action pursuant to (i) title II of the American with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12131, *et seq.*,[1] (ii) title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Section 2000d"),[2] (iii) the Civil Rights Act of 1875, 42 U.S.C. § 1983 ("Section 1983")[3]

---

**1.** Section 12132 of the ADA provides:
Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**2.** Section 2000d provides:

No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**3.** Section 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

and (iv) the Human Rights Law of the State of New York. Plaintiffs allege that defendants, the New York City Board of Education and its Chancellor, individually and in his official capacity, unlawfully engaged in discrimination on the basis of disability and race by allegedly refusing to provide appropriate educational services to Moyo, an alleged gifted child with dyslexia. Plaintiffs seek preliminary and permanent injunctive relief, damages and attorney's fees. Upon plaintiffs' preliminary injunction motion and based upon the complaint, documentary evidence and admissions in open court, the Court determines that it lacks subject matter jurisdiction to adjudicate plaintiffs' federal claims because they failed to exhaust the administrative procedures mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and, therefore, dismisses the suit.

## I.

### *STATUTORY AND REGULATORY BACKGROUND*

The federal government ensures that students with disabilities receive a "free appropriate public education" through IDEA.[4] IDEA creates a comprehensive educational scheme requiring each state that receives federal education funds to design an individualized education program ("IEP") for each disabled child. *See Honig v. Doe*, 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). The IEP is a written statement that sets forth, *inter alia*, the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has

met the goals. 20 U.S.C. § 1401(a)(20). Federal funding is conditioned upon state compliance with IDEA's extensive substantive and procedural requirements. 20 U.S.C. § 1412; *see also Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992).

In *Heldman v. Sobol*, 962 F.2d 148 (2d Cir.1992), the Second Circuit described Congress' rationale for this "unconventional approach":

> Rather than detailing the precise substantive rights applicable to all affected children, Congress opted for individually tailored programs—programs crafted by parents and educators working together to determine what is appropriate for each child. Congress recognized that such an unconventional approach would require extensive procedural safeguards to protect the educational rights of children with disabling conditions.

*Id.* at 150; *see also* 20 U.S.C. § 1414(a)(5) (requiring the development of IEPs, which must be reviewed annually). Primary among the procedural safeguards employed by IDEA is the requirement that states provide parents of disabled students the right to seek review of any decision concerning their children's education. Thus, parents have the right to file complaints about "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E). Parents must initially seek review through an "impartial due process hearing" conducted by either the local school district or state. *Id.* § 1415(b)(2). If the

State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

4. In 1990, Congress changed the name of the Education of the Handicapped Act, Pub.L. No. 101–476, 104 Stat. 1141 (1990), to IDEA. Congress first addressed the education of children with disabilities in 1966 with amendments to the Elementary and Secondary Education Act of

1965 ("ESEA"), Pub.L. No. 89–750, 80 Stat. 1191, 1204 (1966). In 1970, the Education of the Handicapped Act, Pub.L. No. 91–230, 84 Stat. 175, replaced the ESEA provisions. Subsequently, Congress enacted the Education Amendments of 1974, Pub.L. No. 93–380, 88 Stat. 541, 579, 583 (1974), as an interim provision, which for the first time addressed the right of children with disabilities to receive an education. The following year, Congress enacted the Education for All Handicapped Children Act of 1975, which, despite amendments, remains the foundation for IDEA. *See generally Heldman v. Sobol*, 962 F.2d 148, 150 n. 1 (2d Cir.1992).

hearing is conducted by a local school district, they may appeal the decision to the state educational agency. *Id.* § 1415(c). Only after exhaustion of these procedures may parents seek review in federal or state court. *Id.* § 1415(e)(2). New York receives federal education funds and, accordingly, has adopted the IDEA's procedures.[5]

Critical to the issues presented in this case is the reach of IDEA's section 1415(f). Section 1415(f) reads in full:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C. § 790 *et seq.* ], or other Federal statutes protecting the rights of children and youth with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

20 U.S.C. § 1415(f) (emphasis added). Thus, section 1415(f) contains two substantive components, the first conditioned on the second. First, it provides that IDEA is *not* the exclusive avenue by which parents may enforce the rights of disabled children and, therefore, they may invoke other federal statutes to accomplish the same goals. This right to pursue remedies through other federal statutes is conditioned, however, upon section 1415(f)'s second component, which requires exhaustion of IDEA's administrative procedures prior to commencement of the lawsuit if the relief sought is also available under IDEA.

**5.** In *Heldman,* the Second Circuit succinctly described the process that New York state has adopted in order to comply with IDEA:

> In New York state, the IEP is produced by a Committee on Special Education ("CSE"), whose members are appointed by the board of education or trustees of the school district. N.Y.Educ.Law § 4402(1)(b)(1). New York provides for a two-tiered system for the review of IEPs. A hearing officer, appointed by the board of education from a list of state-certified officers, conducts the initial hearing and makes a recommendation to the board. N.Y.Educ.Law § 4404(1); 8 N.Y.C.R.R.

## II.

### *ISSUES*

The initial issue presented is whether claims asserted under the ADA, Section 1983 and Section 2000d are subject to section 1415(f)'s requirement that litigants first exhaust IDEA's administrative procedures before bringing suit to obtain relief available under IDEA. If such claims are subject to IDEA's exhaustion requirement, the Court must determine whether plaintiffs seek relief available under IDEA. Finally, if plaintiffs do seek relief available under IDEA, the Court must determine whether any exceptions to the exhaustion requirement apply.

Because the Court concludes that (i) ADA, Section 1983 and Section 2000d claims are subject to IDEA's exhaustion requirement, (ii) plaintiffs seek relief available under IDEA and (iii) no exception to exhaustion applies, and because there exists no dispute that plaintiffs have failed to exhaust IDEA's administrative procedures,[6] the Court holds that it lacks subject matter jurisdiction over plaintiffs' federal claims and, therefore, *sua sponte* dismisses the suit. *See* Fed.R.Civ. Pro. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"). Plaintiffs thus cannot escape IDEA's exhaustion requirement by drafting a complaint artfully avoiding an IDEA claim where IDEA offers plaintiffs the very relief they seek.

## III.

### *FACTS AND PROCEDURAL HISTORY*

As noted above, plaintiffs allege that Moyo is a *gifted child with dyslexia to whom defen-*

> § 200.5(c)(1). Parties may appeal to [a state review officer] for review of the initial hearing. N.Y.Educ.Law § 4404(2); 8 N.Y.C.R.R. § 276.10.
>
> 962 F.2d at 152.

**6.** Counsel for plaintiffs admitted in open court that plaintiffs failed to exhaust IDEA's administrative procedures before commencing suit. *See* Transcript of Preliminary Injunction Hearing at 8, Statement of Plaintiffs' Counsel, Loren Baily, Esq., (Dec. 2, 1994) ("No question there's not been exhaustion in this case").

dants have denied an equal right to education by denying Moyo the educational services he allegedly requires. Plaintiffs allege that Moyo displayed signs of a learning disability as early as the second grade. Later that same year, in the spring of 1987, plaintiffs allege that Moyo was diagnosed with dyslexia, despite his alleged · exceptional test scores in areas unrelated to reading, such as mathematics.

Plaintiffs enrolled Moyo in a private school for Moyo's third and fourth grades which provided special services for dyslexic students. Plaintiffs sought and received funds from defendants for busing Moyo to and from the private school, which defendants provided after a Committee on Special Education ("CSE") conducted an evaluation of Moyo and concluded that he had a learning disability requiring special education. In the fifth grade, Moyo attended, under the umbrella of the school district's special education program, the Astral Program for Gifted Children, a New York public school. Early in the sixth grade, the CSE conducted an annual review of Moyo and, relying in part upon a psychological report prepared at plaintiffs' request, developed an IEP which provided that Moyo would receive certain modifications in taking tests. Thereafter, Moyo attended a number of public and private schools, each with varying degrees of success and failure, although plaintiffs complain that the public schools did not fully provide for Moyo's educational needs.

In August 1993, just prior to Moyo's 10th grade in school, he was tested at plaintiffs' request and defendants' expense at the Mount Sinai Medical Center's School Problems Center. The test was conducted in an effort to develop a new IEP. The report issued at the conclusion of testing (the "Mount Sinai Report") is at the heart of this lawsuit.[7] On November 19, 1993, the CSE issued its new IEP and, despite review of the Mount Sinai Report, adopted only a few of its recommendations.[8]

On June 30, 1994, plaintiffs requested, pursuant to IDEA, an impartial hearing regarding the November 19, 1993 IEP. On July 28, 1994, a hearing commenced but was adjourned with plaintiffs' consent to give the CSE an opportunity to review plaintiffs' complaints. See Transcript of July 28, 1994 Hearing at 3 (Affidavit of Mae Ng, Esq., Exhibit 1). On both August 30 and September 27, 1994, the hearing reconvened, but each time plaintiffs, represented by Advocates for Children, stated that they were not ready to proceed. See Transcript of Aug. 30, 1994 Hearing at 4 (Affidavit of Mae Ng, Esq., Exhibit 2); Hearing Officer's Final Statement at 1 (Affidavit of Mae Ng, Esq., Exhibit 3). On the latter date, the hearing officer dismissed plaintiffs' complaint without prejudice. Hearing Officer's Final Statement at 1.

On September 26, 1994, one day prior to the last scheduled hearing date, plaintiffs filed this lawsuit. On November 7, 1994, by order to show cause, plaintiffs moved for a preliminary injunction requiring defendants to provide to Moyo those educational services and accommodations recommended in the Mount Sinai Report and obtained a temporary restraining order ("TRO") providing for such relief (Johnson, D.J.).[9] By order dated

---

7. According to plaintiffs, the Mount Sinai Report recommended, *inter alia,* that Moyo receive (i) a "small, structured school setting with teachers and professionals who understand the nature of Moyo's learning disabilities" (Compl. ¶ 119); (ii) tutorial support as often as three times per week; (iii) word processing help for all written assignments; (iv) the use of a hand-held spell-checker in school; (v) identification (but not downgrading) of spelling errors; (vi) permission to tape record class lectures; (vii) the teachers' classroom notes; (viii) written copies of homework assignments; (ix) the use of books "on tape" through an organization called Recording for the Blind; (x) extra time on written examinations and unlimited time when taking standardized tests such as the PSATs and SATs; and (xi)

computer courses as a substitute for courses in foreign language. Compl. ¶ 119.

8. The November 19, 1993 IEP provided Moyo with the following modifications in taking examinations: (i) No time limit will be imposed; (ii) all test taking will occur in special facilities; (iii) the questions on tests will be read aloud; (iv) answers may be recorded "in any manner" (Compl. ¶ 123); and (v) a calculator may be used. Compl. ¶ 123.

9. The issuance of the TRO constituted the sole involvement of Judge Sterling Johnson, Jr. in this case; thereafter, it was transferred to Judge Frederic Block.

November 22, 1994, the Court extended the TRO to December 6, 1994 and modified it to require the parties to cooperate to develop a new IEP. On December 12, 1994, after defendants consented to a further extension of the TRO, the TRO expired and the parties reported to the Court that they had indeed cooperated to develop a new IEP. The new IEP, however, does not implement all of the recommendations of the Mount Sinai Report and, therefore, plaintiffs maintain that this action remains viable, notwithstanding the fact that they have admitted that they have not exhausted IDEA's administrative procedures. *See supra* n. 6.

## IV.

### DISCUSSION

#### A. *IDEA's Exhaustion Requirement*

■ IDEA's exhaustion requirement permits states and local agencies to employ their educational expertise, "affords full exploration of technical educational issues, furthers development of a complete factual record and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children." *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1303 (9th Cir.1992) (citing *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969)); *see also Heldman*, 962 F.2d at 159 ("The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes").

The failure to exhaust such administrative procedures deprives the court of subject matter jurisdiction. *Hoeft*, 967 F.2d at 1302 ("the district court granted the motion to dismiss [for lack of subject matter jurisdiction], and ... we affirm"); *Jacky W. v. New York City Board of Educ.*, 848 F.Supp. 358, 360 (E.D.N.Y.1994) ("Jurisdiction to review claims for violation of IDEA is vested in district courts only upon the exhaustion of available state administrative review"); *Stellato v. Board of Educ.*, 842 F.Supp. 1512, 1515 (N.D.N.Y.1994) ("Simply stated, unless plaintiffs first exhaust available state admin-

istrative remedies [under IDEA], the federal courts are without jurisdiction to hear the case"); *Moss v. Smith*, 794 F.Supp. 11, 12–15 (D.D.C.1992) (where the plaintiffs failed to exhaust IDEA's administrative procedures prior to seeking a TRO, the court stated: "[T]he Court *sua sponte* dismisses the case for lack of subject matter jurisdiction"); *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1029 (S.D.N.Y.1987) ("Unless plaintiff has exhausted the administrative remedy, the federal courts lack jurisdiction to hear the case").

#### B. *Application Of IDEA's Exhaustion Requirement To Plaintiffs' Federal Claims*

##### 1. *The Section 1983 And Section 2000d Claims*

■ As noted above, section 1415(f), which was enacted in 1986, prohibits actions under statutes other than IDEA for relief that IDEA could provide if the plaintiff has failed to exhaust IDEA's administrative procedures. There exists no doubt that section 1415(f) applies to claims asserted under Section 1983 and Section 2000d.

First, the legislative history to section 1415(f) expressly states that the provision will apply to claims asserted under Section 1983: "It is the conferees' intent that actions brought under 42 U.S.C. § 1983 are governed by this [section 1415(f) ] provision." H.R.Conf.Rep. No. 687, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 1807. Second, a number of courts have dismissed Section 1983 claims for failure to comply with section 1415(f)'s exhaustion requirement. *See, e.g., Mrs. W. v. Tirozzi*, 832 F.2d 748, 756 (2d Cir.1987) (IDEA's "remedies must be exhausted prior to instituting a civil action in federal court pursuant to ... § 1983"); *Association for Comm. Living in Colo. v. Romer*, 992 F.2d 1040, 1044 (10th Cir.1993) ("A plaintiff must exhaust these same [IDEA] remedies before bringing a 42 U.S.C. § 1983 action for relief that is also available under the IDEA"); *Buffolino v. Board of Educ.*, 729 F.Supp. 240, 244–45 (E.D.N.Y.1990) (same). Third, both statutes existed long prior to enactment of section 1415(f) and, therefore, Congress had ample opportunity

to exempt these statutes from section 1415(f)'s reach if it so desired. Finally, Section 2000d shares the same remedies as and should be construed consistently with title V of the Rehabilitation Act of 1973—a provision specifically cited to in section 1415(f) as plainly within its reach. 20 U.S.C. § 1415(f); 29 U.S.C. § 794a ("The remedies, procedures, and rights set forth in [Section 2000d] shall be available to any person aggrieved . . . under [section 504 of the Rehabilitation Act of 1973]").

### 2. *The ADA Claim*

A question arises, however, regarding the applicability of IDEA's exhaustion requirement to claims asserted under the ADA. Two sources give rise to this question: First, the ADA was enacted after enactment of section 1415(f) and, second, a Department of Justice ("DOJ") regulation implementing title II of the ADA provides that a complainant may "at any time" file a private lawsuit without first exhausting the ADA's administrative procedures. 28 C.F.R. § 35.172; *see also* 28 C.F.R. § 35.172, App. A ("Because the [ADA] does not require exhaustion of administrative remedies, the complainant may elect to proceed with a private suit at any time"). The Court answers the question by ascertaining Congressional intent through review of the plain language of section 1415(f), examination of cases interpreting section 1415(f) as it relates to claims under the ADA, comparison of the ADA to title V of the Rehabilitation Act of 1973 (the "Rehabilitation Act") and application of fundamental principles of statutory construction. The Court concludes that the ADA in fact is bound by IDEA's exhaustion requirement for claims seeking relief available under IDEA.

The Court notes at the outset that the plain language of section 1415(f) speaks to all federal statutes which may offer relief available under IDEA. The section contains no exceptions on its face and the Court could find, on that basis alone, that section 1415(f) applies to claims asserted under the ADA. The Court also notes that since Congress enacted the ADA without expressly exempting it from the reach of section 1415(f), an inference may be drawn that Congress did not intend to permit claims under the ADA to bypass IDEA's exhaustion requirement.

The Court need not rely solely on the plain language of section 1415(f), however, in order to reach its conclusion because at least one court within this circuit has also reached the same result. In *W.G. v. Senatore,* 18 F.3d 60, 62–63 (2d Cir.1994), the Second Circuit, in describing the procedural posture of the case, recounted that the court below (D.Conn.) dismissed for lack of subject matter jurisdiction ADA (and Section 1983) claims on the ground that plaintiffs failed to comply with section 1415(f)'s exhaustion requirement. *See also Nagle v. Wilson School Dist.,* 1994 WL 534813 (E.D.Pa. Sept. 26, 1994) (quoting section 1415(f)'s exhaustion requirement and stating that the plaintiffs' ADA, Section 1983 and other claims "are clearly pre-empted by § 1415(f)").

Further support is found by examining the relationship between the ADA and the Rehabilitation Act. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of a disability "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Actions brought under section 504 do not generally require exhaustion of administrative remedies, *see Tuck v. HCA Health Servs. of Tenn., Inc.,* 7 F.3d 465, 471 (6th Cir.1993) ("[E]very court of appeals[ ] which has considered the issue of whether to apply the exhaustion requirement to non-federal employees under [section 504] has decided not to apply the requirement"); *Henchey v. Town of North Greenbush,* 831 F.Supp. 960, 968 (N.D.N.Y.1993) ("A majority of courts addressing this issue have [sic] declined to require the exhaustion of administrative remedies"), except in cases seeking relief available under IDEA. *See* 20 U.S.C. § 1415(f) (specifically citing to the Rehabilitation Act as an example of a federal statute bound by IDEA's exhaustion requirement).

Title II of the ADA simply extends section 504 to all programs and services provided by state and local governments:

> The first purpose [of title II of the ADA] is to make applicable the prohibition against discrimination on the basis of disability, currently set out in regulations implementing section 504 of the Rehabilitation Act of

1973, to all programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto.

H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 366 (1990). In fact, the enforcement provision of title II of the ADA actually incorporates the enforcement provision of the Rehabilitation Act. 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability"). The regulations implementing title II of the ADA likewise confirm the uniformity of interpretation between the ADA and the Rehabilitation Act: "[T]his part shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act ... or the regulations issued by Federal agencies pursuant to that title." 28 C.F.R. § 35.103. Even plaintiffs urge that the Court construe the ADA and the Rehabilitation Act consistently. *See* Plaintiffs' Brief In Support of Motion for Preliminary Injunction at 6 ("As the ADA incorporates the remedies of the Rehabilitation Act by reference, it follows that the caselaw applicable to § 504 claims is directly relevant"). Since claims under the Rehabilitation Act are bound by IDEA's exhaustion requirement, *a fortiori*, claims under the ADA should be likewise bound.

To the extent that one could interpret the DOJ regulation to conflict with section 1415(f), the Court applies the fundamental principle of statutory construction that courts shall "not interpret an agency regulation to thwart a statutory mandate." *Insurance Co. of North America v. Gee*, 702 F.2d 411, 414 (2d Cir.1983); *see also Foster v. Celani*, 849 F.2d 91, 92 (2d Cir.1988) ("[R]egulations that contravene congressional intent cannot be upheld"); *Robbins v. Bentsen*, 41 F.3d 1195, 1198 (7th Cir.1994) ("Regulations cannot trump the plain language of statutes, and we will not read the two to conflict where such a reading is unnecessary"). The Court thus interprets the DOJ regulation providing that a complainant need not exhaust administrative procedures prior to filing an ADA claim

to apply only to those administrative procedures implemented under the ADA; it does not apply to thwart section 1415(f)'s explicit statutory mandate that IDEA's administrative procedures must be exhausted for claims seeking relief available under IDEA.

The conclusion is thus inescapable: The ADA is bound by IDEA's exhaustion requirement for claims seeking relief available under IDEA despite the fact that a plaintiff generally need not exhaust administrative remedies before pursuing an ADA claim *unrelated* to IDEA. Assuming, but not deciding, that plaintiffs state a claim under the ADA (or under Section 1983 or Section 2000d)—a view observed in the light most favorable to plaintiffs—they may maintain their suit only if they establish that (i) the relief they seek is not available under IDEA or (ii) an exception to the exhaustion requirement applies.

### C. *The Relief Plaintiffs' Seek Is Available Under IDEA*

█ Plaintiffs request for temporary and permanent injunctive relief imposing upon defendants the requirement to provide the services and accommodations identified in the Mount Sinai Report indisputably raises issues addressable under IDEA. Plaintiffs in substance challenge the adequacy of the IEP created for Moyo and seek imposition of their own more expansive IEP. This is precisely the type of remedy best fashioned by the educational experts skilled in developing such programs and provides a textbook example of the types of cases justifying administrative exhaustion.

At the Court's suggestion, counsel for plaintiffs submitted a supplemental brief addressing section 1415(f)'s exhaustion requirement. In an apparent attempt to circumvent section 1415(f), the supplemental brief asserts—despite the complaint's allegations detailing the extensive history of special education services sought for and received by Moyo—that "plaintiff does not need nor desire special education." Plaintiffs Supplemental Brief at 6 (Dec. 12, 1994). Rather, according to plaintiffs, Moyo is a "gifted, mainstream child in need of services designed to address the problem of dyslexia."

*Id.* at 1. From this, plaintiffs claim that the relief they seek is beyond the bounds of IDEA.[10]

Dyslexia is specifically listed in IDEA as a "learning disability." 20 U.S.C. § 1401(a)(15); *see also* 8 N.Y.C.R.R. § 200.1(mm)(6). Plaintiffs plead as much in their complaint. Compl. ¶ 34. ("Moyo Hope was tested . . . and determined to have dyslexia, a learning disability"). The Mount Sinai Report also concluded that Moyo "has learning disabilities." Mount Sinai Report at 1. In addition, plaintiffs have participated with the CSE in developing IEPs for Moyo—each of which has classified Moyo as learning disabled—and they have not objected to such classifications. Importantly, Moyo would not be eligible for any of the services and accommodations he previously received and currently receives—albeit less than those sought by plaintiffs—if he were not disabled.

Plaintiffs do not seem to dispute that lawsuits challenging the educational services and accommodations provided to dyslectic students generally would fall within the ambit of IDEA. Rather, they distinguish Moyo from those students on the ground that, in addition to being dyslexiac, he is "gifted." The Court holds that such a distinguishment is a difference without legal significance. Even as a "gifted" student with dyslexia, any challenge to the educational services and accommodations provided to Moyo would seem to fall squarely and more properly within the expertise of education professionals than in federal court. The Court is not unsympathetic to plaintiffs' alleged plight, but is mindful of the consequences of opening the door to litigants dissatisfied with educational placement without first affording educators the opportunity to correct any alleged errors.

### D. *No Exception To IDEA's Exhaustion Requirement Applies In This Case*

■ IDEA's exhaustion requirement is not without its exceptions. The legislative history identifies three:

[T]here are certain situations in which it is not appropriate to require the use of due process and review procedures set out in [20 U.S.C. § 1415(b) and (c)] of the [IDEA] before filing a law suit. These include complaints that: (1) it would be futile to use the due process procedures . . .; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; [and] (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought).

H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985). The Second Circuit in *Heldman* effectively collapsed (2) and (3) above into the futility exception listed as (1) above: "The policies underlying the exhaustion requirement do not come into play . . . when pursuit of administrative remedies would be *futile* because the agency either *was acting in violation of the law* or *was unable to remedy the alleged injury*." 962 F.2d at 159 (emphasis added).

Although plaintiffs have not argued that their case falls within any exception to exhaustion, the Court feels compelled to undertake its own analysis. In this regard, plaintiffs make two allegations worthy of discussion.

First, plaintiffs seem to allege that defendants did not comply with providing the services and accommodations specified in the November 19, 1993 IEP. Plaintiffs' allegations on this point, however, are somewhat contradictory. At one point in the complaint, plaintiffs allege that "Brooklyn College Academy refused to provide the testing modifications required by the IEP." Compl. ¶ 126. Only two sentences later, however, plaintiffs allege that "Moyo Hope, when given testing modifications, passed the Earth Science Regents exam with a grade of 83." Compl. ¶ 128. Plaintiffs do not specify how Moyo may have received testing modifications

---

10. Plaintiffs' counsel orally offered the same argument in explaining the substance of the supplemental brief:

THE COURT: Why do you say he's not a child covered by IDEA?

MS. BAILEY: Because he's not in need of special education services. He's a gifted child. Transcript of Preliminary Injunction Hearing at 13 (Dec. 12, 1994).

when they had alleged that none were offered. In order to clarify, the Court engaged in the following colloquy with plaintiffs' counsel:

> THE COURT: I guess I want to know the point, whether or not you have any concerns, whether the existing [IEP], not the one that may be replaced, whether or not that is complied with.
>
> MS. BAILEY: I believe in essence it has been.

Transcript of Preliminary Injunction Hearing at 8–9 (Dec. 2, 1994). Since plaintiffs' counsel stated that plaintiffs do not have a complaint regarding compliance with the November 19, 1993 IEP, the Court need not analyze further whether to grant an exception to exhaustion on this ground.

Second, and more importantly, plaintiffs allege in conclusory terms that "[t]he practices and actions complained of herein are, on information and belief, typical of the practices and actions experienced by African–American and Latino students in need of supportive services within the defendant Board of Education." Compl. ¶ 132. This allegation, which the Court deems true for purposes of this analysis, arguably states a facial violation of IDEA on the ground that defendants engaged in wide-spread, systemic discrimination and "adopted a policy or pursued a practice of general applicability that is contrary to the law." H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985). Before determining whether this conclusory allegation suffices to warrant an exception to the exhaustion requirement, however, the Court "must also weigh the importance of the final interest served by the exhaustion doctrine: affording the agency an opportunity to consider and correct errors." *Hoeft*, 967 F.2d at 1307. As aptly stated by the Ninth Circuit in *Hoeft*:

> Plaintiffs' challenge is to local school district policies, not state policies. States have ultimate responsibility for ensuring that local educational programs comply

with the IDEA. 20 U.S.C. § 1414(b). In evaluating local compliance, states are directed to "consider any decision made pursuant to a [due process] hearing held under section 1415 ... which is adverse to the local education agency." 20 U.S.C. § 1414(b)(3). The IDEA's administrative review scheme thus represents an important resource to aid states in fulfilling their oversight responsibilities. Circumventing this scheme where local policies are challenged undermines the IDEA's enforcement structure.

*Id.* Because plaintiffs allege that defendants, and not the state, adopted the discrimination policies of which they complain, the Court holds that the purpose of the exhaustion doctrine would be undercut by allowing plaintiffs to seek redress in this tribunal rather than affording the state (and defendants) the opportunity to rectify any errors. Hence, an exception to exhaustion is not available to plaintiffs in this case.

## V.

## CONCLUSION

Although this matter came before the Court on plaintiffs' motion for preliminary injunctive relief, the Court has determined that it lacks subject matter jurisdiction and must therefore dismiss the federal claims.[11] The Court declines to exercise its discretion and adjudicate plaintiffs' state law claim in the absence of an independent federal jurisdictional basis. 28 U.S.C. § 1367 ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction"); *see Travelers Ins. Co. v. Keeling*, 996 F.2d 1485, 1490 (2d Cir.1993) (" 'in the usual case in which all federal-law claims are eliminated before trial, th[e] balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims' ") (*quoting Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614,

---

11. As noted in another case under similar circumstances: "Since we find we lack subject matter jurisdiction, we do not make the specific findings of fact which would be required on a motion for a preliminary injunction under the standard recognized in the Second Circuit." *Seafarers, Int'l Union v. Grand Bassa Tankers, Inc.*, 1980 WL 2194 at *11 n. 22 (E.D.N.Y. Oct. 10, 1980).

619 n. 7, 98 L.Ed.2d 720 (1988)). Plaintiffs' motion for preliminary injunctive relief is hereby denied and the action is dismissed for lack of subject matter jurisdiction.

**SO ORDERED.**