**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ALLIED SYSTEMS, INC., Defendant.**

No. 97–CV–1396.

United States District Court, N.D. New York.

Feb. 19, 1999.

Equal Employment, Opportunity Commission, New York District Office, New York (Michael B. Ranis, of counsel), for plaintiff.

Nixon Hargrave Law Firm, Albany, NY (Daniel J. Hureau, of counsel), Alston Bird Law Firm, Atlanta GA, (Forrest W. Hunter, of counsel) for defendant.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

The Equal Employment Opportunity Commission ("EEOC") commenced the instant litigation against Allied Systems, Ltd. ("Allied") claiming violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Presently before the Court is Allied's motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Complaint in its entirety.

## I. BACKGROUND

Because this is a motion for summary judgment by Allied, the following facts are presented in the light most favorable to the EEOC. *See Ertman v. United States,* 165 F.3d 204, 205 (2d Cir.1999).

Allied is a trucking company in the business of transporting automobiles. Allied employs approximately 10,000 employees at about 100 terminals. Joseph Eissing ("Eissing") began working for Allied as a car hauler at the Selkirk, New York terminal in April 1990.

A car hauler position requires loading and unloading vehicles onto and off the trailer portion of a car carrier. According to the job description, drivers are required to: (1) pass the Department of Transportation ("DOT") physical and comply with DOT regulations [1]; (2) load and unload automobiles from both dock and truck skids [2] weighing up to seventy-five pounds; (3) have the agility to climb to heights of 12 to 13 feet and be able to climb into and out of autos at this height, including from inside the trailer; (4) drive up to 10 hours and be on duty up to 15 hours; (5) be able to lift up to seventy-five pounds from a crouching position and exert up to seventy-five pound of pressure in tying down autos; (6) have better-than-average eye-hand coordination to operate hydraulic lifts; and (7) work in all types of weather and temperatures. On average, an Allied car hauler in Selkirk will load, deliver and unload ten vehicles per day. Typically, a car hauler spends approximately 65% of the day driving and 35% of the day loading and unloading vehicles.

In April 1988, Eissing was involved in a head-on collision in which he sustained injuries to his back, neck and elbows. Eissing's personal physician, Dr. James Striker ("Dr.Striker"), diagnosed Eissing with a mild concussion and a cervical strain. Dr. Striker concluded that Eissing was totally disabled from working as a car hauler.

As a result of the accident, Eissing commenced a tort action in Supreme Court, Albany County. In that action, Eissing alleged that he suffered injuries that rendered him unable to work as a car hauler for the remainder of his normal life expectancy. In support of his claim for future lost wages, Eissing offered the testimony of Dr. Dominic J. Belmonte ("Dr.Belmonte"), Allied's company doctor. Dr. Belmonte stated that, in his medical opinion, Eissing would never work again as a car hauler because of the injuries he sustained from the 1988 accident. Eissing was unable to work for various periods of

---

1. DOT regulations require operators of commercial motor vehicles to be "physically qualified" and to have in their possession a valid Medical Examiner's Certificate. 49 C.F.R. § 391.41, *et seq.* Motor carriers are prohibited from permitting any person who is not in compliance with the applicable regulations to drive a commercial motor vehicle. *See* 49 C.F.R. § 391.11(a).

2. "Skids" are metal ramps that slide out from the body of the trailer to the ground and are used to drive vehicles onto the trailer. The skids on the trucks used by Allied weigh approximately 75 pounds.

time because of the injuries he sustained in the accident.

In April 1990, Eissing went to Dr. Belmonte to obtain a DOT Medical Examiner's Certificate ("DOTMEC"). After a thorough examination, Dr. Belmonte issued a DOT-MEC, which, by operation of law, expired after two years. *See* 49 C.F.R. § 391.45(b)(1). In April 1991, Eissing went to Dr. Striker to obtain a release to return to work. Drs. Striker and Belmonte released Eissing to return to work. Thus, on April 5, 1991, Eissing returned to work as a car hauler for Allied.

In June 1991, Eissing re-injured his neck while untying a vehicle. Dr. Belmonte diagnosed Eissing with a cervical strain and a herniated cervical disk. Eissing's neck began to feel better after a while, but he re-injured it while doing yard work at his home. For several years following the 1991 injuries, Eissing was treated and examined by Drs. Striker and Belmonte. Both doctors concluded that Eissing was disabled from his position as a car hauler and would remain so on a permanent basis.

On or about June 1, 1993, Eissing presented a note from Dr. Striker to James Lauda, manager of Allied's Selkirk terminal, stating that Eissing could return to work as a car hauler if Allied provided him with aluminum skids and a high back lumbar support. According to Dr. Striker, though Eissing could perform the functions of the job without these items, they would be helpful and would make Eissing more comfortable in performing his job. At this time, Allied already was using the lightest aluminum skids available that were consistent with its business needs.

In response, Lauda referred Eissing to Dr. Belmonte for a "fitness for duty" examination and a DOT physical.[3] Dr. Belmonte examined Eissing on June 3, 1993 and concluded that:

[i]t is my medical opinion, on the basis of the history and clinical examination, as well as the volume of medical records compiled over the past two years, that Mr. Joseph Eissing persists with underlying

pathology to his neck and back secondary to his injuries in 1988 and 1991. He is relatively asymptomatic at this time, although this is likely only a remission since the underlying pathology is unchanged. Given his current clinical examination, and with the knowledge of his underlying pathology, I would at this time be unable to release Mr. Eissing to return to full and unrestricted work in his usual capacity as a Car Hauler for Allied Systems.

Belmonte opined that Eissing undergo physical therapy and, upon completion, a physical trial to re-evaluate his ability to return to work.

Eissing went to physical therapy. The physical therapy records reveal that Eissing was fully capable of performing all the functions of a car hauler. The physical therapist reported that Eissing's "physical abilities matched the description of Car Hauler", but that "[d]ue to patient's given diagnosis and previous history I would continue to agree with [the restrictions of using lightweight aluminum skids and a high back lumbar support]." Dr. Belmonte sought clarification of the physical therapy report. The physical therapist responded that "[i]t is generally not advisable for someone with this condition to return to an occupation that involves vibratory stress, but if Mr. Eissing and his doctors have no objection to him returning to work I certainly would not try to second guess their expertise."

Upon review of the physical therapy records and Eissing's prior history, Dr. Belmonte concluded that he was "unable to release Mr. Eissing to return to work in his usual capacity for Allied Systems at this time without significant restrictions which would essentially preclude the performance of some mandatory functions of his position."

On July 13, 1993, Eissing again presented a note from Dr. Striker to Lauda stating that Eissing could return to work without any restrictions or accommodations. Because of the conflict between Drs. Striker and Belmonte, the two physicians agreed to send

---

**3.** Both the Collective Bargaining Agreement ("CBA") in effect between Allied and the Teamsters and the DOT regulations permit Allied to require Eissing to undergo physical examination by Allied's physician. *See* CBA, Art. 43(a); 49 C.F.R. § 391.47.

Eissing to an independent, third doctor, William Rogers.[4]

After examining Eissing and reviewing his medical history, Dr. Rogers concluded that:

I am quite familiar with the job of delivering cars. I have inspected the job site in the past .... The job is quite physical with not only lifting of skids, but with climbing, strenuous pulling when ratcheting down cars and in general in awkward positions. In view of the MRI findings of Mr. Eissing [which revealed a ruptured disc at C6–7 on the right], I feel that if he returned to this job it would only be a matter of time before he would become symptomatic and be disabled again. His physical is completely normal at this time and his functional capacity actually shows good strength. Though I would not recommend that he return to his position of driving a car carrier I do feel that he could return to truck driving in general depending on the specific physical requirements of a particular position. I do not think the driving itself will be a problem.

It is not disputed that Eissing did not possess a valid DOTMEC between April 16, 1992 and December 22, 1993. It is disputed, however, as to whether Eissing possessed a valid DOTMEC after December 22, 1993. Allied contends that Eissing did not present a valid DOTMEC from Drs. Belmonte or Rogers until June 1996. The EEOC claims that Eissing orally informed Allied that he obtained a DOTMEC from a Dr. Casey in December 1993, but that Allied refused to reinstate Eissing until he was examined by either Drs. Belmonte or Rogers.[5]

In March 1994, Eissing filed a charge of discrimination with the EEOC. The charge alleged that "[in June, 1991, I suffered an on-the-job injury. I have not been allowed to return to work, either with or without accommodations. The last time that I was denied the opportunity to return to work was October 1, 1993. I believe that I have not been allowed to work because the company perceives me to be disabled.]" The EEOC attempted conciliation with Allied, but an agreement could not be reached.

On September 26, 1997, the EEOC commenced the instant lawsuit against Allied, claiming that it discriminated against Eissing on account of his disability, and that Allied perpetuates a policy of denying employment to individuals with disabilities and refusing to provide reasonable accommodations. Allied now moves for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Complaint in its entirety.

## II. DISCUSSION

### A. Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the non-movant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [ ] rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED. R. CIV. P. 56(e); *see BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615

---

4. The CBA provided that "[i]f the two (2) physician disagree as to the employee's physical ... condition, such two (2) physicians shall mutually select a third (3rd) impartial physician.... Such third (3rd) physician's opinion shall be final and binding upon all parties." CBA, Art. 43(c). A similar provision is found at 49 C.F.R. § 391.47 which provides for a procedure when there is a disagreement between the employee's personal physician and the employer's company physician.

5. Dr. Casey apparently is the company physician for one of Allied's competitors. Regardless, Dr. Casey was neither an Allied company physician nor an independent physician mutually selected by Drs. Belmonte and Striker.

(2d Cir.1996). With this standard in mind, the Court will now address Allied's motion for summary judgment.

### B. The ADA Claim

■ To state a claim under the ADA, a plaintiff must establish that: (1) the employer is subject to the ADA; (2) the employee has a disability, (3) the employee could perform the essential functions of the job, with or without reasonable accommodation, and (4) the employer had notice of the disability and failed to provide accommodation. *Lyons v. Legal Aid Society,* 68 F.3d 1512, 1515 (2d Cir.1995).

### 1. Allied is Subject to the ADA

There is no question that the first prong is met because Allied employs over fifteen employees for each working day in each of twenty or more calendar weeks per year. *See* 42 U.S.C. § 12111(5).

### 2. Whether Eissing Had A "Disability" Under the ADA

Turning to the second prong, to be disabled under the ADA, an employee must:

(a) have a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(b) have a record of such an impairment; or

(c) be regarded as having such an impairment.

42 U.S.C. § 12102(2). Here, the parties dispute whether Eissing was disabled under the ADA. The Court need not address that question, however, because the EEOC cannot establish that Eissing was able to perform the essential functions of the job.

### 3. Whether Eissing Could Perform the Essential Functions of the Job

■ It is not enough that an individual merely be disabled; to be protected under the ADA, the individual must be a "qualified individual with a disability." A qualified individual with a disability is statutorily defined to mean:

an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.... [C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written job description ... this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

The first step in ascertaining whether an individual is qualified is "to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. app. § 1630.2(m). "The second step is to determine whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation." *Id.*

The parties do not dispute the essential functions of a car hauler. The parties agree that a car hauler must be able to load and unload vehicles off the trailer, position skids weighing approximately seventy-five pounds, climb onto and off of the trailer, climb into and out of car windows in confined spaces, secure the vehicle to the trailer using chains and hooks, and exert up to seventy-five pounds of pressure in tying down the vehicles. Importantly, car haulers are required to have a DOTMEC, *see* 49 C.F.R. § 391.43, and employers, such as Allied, are prohibited from allowing drivers who do not have a valid DOTMEC to operate a commercial motor vehicle. 49 C.F.R. § 391.11(a). These requirements are all spelled out in the written job description of the car hauler position. A typical day on the job entails 35% of loading and unloading vehicles and 65% of driving.

The parties agree that Eissing did not have a valid DOTMEC from April 16, 1992 and December 22, 1993. Allied argues that because Eissing did not have a valid DOTMEC during this time, he did not have the necessary certifications to be a car hauler and, therefore, was not a qualified individual with a disability. Allied also claims that Eissing never provided it with a DOTMEC from either Drs. Belmonte or Rogers between December 22, 1993 and June 1996,

when it rehired Eissing, and thus, Eissing continuously failed to have the requisite qualifications for the job.

The EEOC responds that Eissing did not possess a DOTMEC in the period between June 1, 1993 and December 22, 1993 because Allied's physician, Dr. Belmonte, refused to approve him for such a certificate in violation of the ADA.[6] The EEOC further asserts that, although Eissing did not physically present a DOTMEC to Allied, he telephoned Lauda after December 22, 1993 and told him that he had passed the DOT physical and that he wanted to return to work. Lauda is alleged to have stated that Eissing would have to be cleared by the company physician before being able to return to work.

Accepting the EEOC's version of the facts as true, the Court finds that Allied is entitled to summary judgment. Without question, a valid DOTMEC is an essential requirement of the car hauler position. As explained below, Eissing's failure to obtain a DOTMEC precluded him from being a qualified individual with a disability. *See* 29 C.F.R. app. § 1630.2(m); *Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 631 (7th Cir.1998); *Daugherty v. City of El Paso,* 56 F.3d 695, 697 (5th Cir.1995) *Rice v. Genova Prods., Inc.,* 978 F.Supp. 813, 821–22 (N.D.Ind.1997); *Long v. Chicago Transit Auth.,* 979 F.Supp. 1214, 1217 (N.D.Ill.1997); *Murphy v. United Parcel Service,* 946 F.Supp. 872, 883–84 (D.Kan. 1996); *Christopher v. Laidlaw Transit, Inc.,* 899 F.Supp. 1224, 1227 (S.D.N.Y.1995).

### a. Whether Allied Failed to Provide Eissing with a DOTMEC in Violation of the ADA

■ The EEOC's assertion that Eissing was unable to obtain a DOTMEC because Allied refused to issue a DOTMEC in violation of the ADA is without merit. The undisputed evidence demonstrates that, as of January 1993, Eissing's own physician, Dr. Striker, believed Eissing to be totally disabled and that Eissing would be unable to return to work as a car hauler. By the summer of 1993, Dr. Striker's opinion, for whatever reason, had changed and he ultimately released Eissing to return to work without any restrictions. However, Eissing had still not procured a DOTMEC.

Allied sent Eissing for an examination by Dr. Belmonte, who did not believe that Eissing was physically qualified and, therefore, declined to issue a DOTMEC for Eissing. Dr. Belmonte sent Eissing for a functional capacity evaluation. The physical therapist's report indicated that Eissing was physically capable of returning to work as a car hauler. Dr. Belmonte, however, persisted in his refusal to issue a DOTMEC.

Because Allied's physician and Eissing' personal physician disagreed whether Eissing was capable of returning to work as a car hauler, Drs. Belmonte and Striker mutually selected an independent third physician, Dr. Rogers, to evaluate Eissing. This procedure of having the employee's personal physician and the employer's company physician select an independent third physician whose opinion would be final and binding on the parties was in full compliance with the CBA in effect between Allied and the Teamsters Union and was accepted protocol under DOT regulations. *See* 49 C.F.R. § 391.47 (Resolution of Conflicts of Medical Evaluation).

Rogers examined Eissing and, by report dated August 6, 1993, declined to issue a DOTMEC to Eissing. Thus, there had been a conclusive resolution that Eissing was not qualified to perform the essential functions of the job because he was not "physically qualified" to obtain a DOTMEC. Although, under the CBA, the decision of Rogers was final and binding, Eissing presumably could have applied to the DOT to resolve the dispute among the physicians. *See* 49 C.F.R. § 391.47. The EEOC has not submitted any evidence demonstrating that Eissing contacted the DOT to obtain review of the physicians' conclusions. Accordingly, there is no evidence that Allied improperly refused to issue a DOTMEC.

### b. Whether Allied Improperly Refused to Accept the DOTMEC Issued by Dr. Casey

In late 1993 or early 1994, Eissing informed Allied that he obtained a DOTMEC

---

6. The EEOC apparently concedes that Allied did not discriminate against Eissing during the period of April 16, 1992 until June 1, 1993.

from Dr. Casey and that he wanted to return to work. Allied, however, refused to reinstate Eissing claiming that he needed to obtain a DOTMEC from either Drs. Belmonte or Rogers. Eissing never provided Allied with a DOTMEC from Drs. Belmonte or Rogers until July 1996, after which Allied rehired Eissing. There was no change of circumstances between early 1994 and July 1996 to support an inference that Allied made any employment decisions in that period of time. During that time, Allied merely continued in its refusal to rehire Eissing without a DOTMEC from Belmonte or Rogers.

■ Allied was entitled to require Eissing to obtain a DOTMEC from its company physician or, in the event that its company physician disagreed with Eissing's personal physician, to have an examination conducted by an independent third physician. *See Campbell v. Federal Express, Corp.,* 918 F.Supp. 912 (D.Md.1996); *Rice,* 978 F.Supp. at 821–822; *see also Murphy,* 946 F.Supp. 872 (employer's independent review of medical examination revealed that a DOTMEC was improperly issued and supported employee's termination). Allied was not required to accept the determination of Dr. Casey, who apparently is a physician for one of Allied's competitors. "As a matter of law, [Allied] was not bound to accede to determinations made by medical professionals retained by its competitors; [Allied] was entitled to rely on the determinations made by its medical professionals." *See Campbell,* 918 F.Supp. at 918; *Rice,* 978 F.Supp. at 821–22; *Prado v. Continental Air Transport Co.,* 982 F.Supp. 1304, 1307–08 (N.D.Ill.1997). Even if Casey was not a competitor's physician, Allied was entitled to have Eissing examined by Dr. Belmonte or an independent physician mutually selected by Allied's company physician and Eissing's personal physician. *See* 49 C.F.R. § 391.49; CBA, Art. 43(a), (b).

Further, the EEOC may not challenge Drs. Belmonte's or Rogers' decisions in this Court. DOT regulations at 49 C.F.R. § 391.47 provide for a mechanism of administrative review in the event that "there is a disagreement between the physician for the driver and the physician for the motor carri-

er concerning the driver's qualification." 49 C.F.R. § 391.47(b)(2). "It is exactly because reasonable medical judgments as to such subjective assessments, made in good faith, may reasonably differ, that an extra-statutory exhaustion requirement is justified here." *Campbell v. Federal Express Corp.,* 918 F.Supp. 912, 918 (D.Md.1996); *see Rice,* 978 F.Supp. at 821–22; *Prado,* 982 F.Supp. at 1307. "A party who fails to exhaust administrative remedies is precluded from raising those issues in the district court." *Prado,* 982 F.Supp. at 1308 (citing *Reiter v. Cooper,* 507 U.S. 258, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993)); *see Hope v. Cortines,* 872 F.Supp. 14, *aff'd,* 69 F.3d 687 (2d Cir. 1995). "It is undisputed that [Eissing] failed to pursue his administrative remedies under 49 C.F.R. § 391.47 before filing his complaint with [the EEOC or] the court. The court will not abrogate clear congressional intent which vests driver fitness issues in the Secretary of Transportation. 49 U.S.C. § 31136(a)(3). Nor will the court usurp the powers of the [Office of Motor Carrier Research and Standards] to determine whether a physician's examination procedures were flawed or conclusions erroneous." *Prado,* 982 F.Supp. at 1308 (citing 49 C.F.R. § 391.47; *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 114 S.Ct. 771, 775–76, 127 L.Ed.2d 29 (1994)).

Accordingly, because Eissing failed to obtain a DOTMEC during the time periods at issue here, he was not a qualified individual with a disability and the EEOC's Complaint must fail.

## C. The EEOC's Pattern or Practice Claim

■ The EEOC also claims that Allied perpetuates a pattern or practice of refusing to hire individuals with disabilities or making reasonable accommodations in violation of the ADA. To make out a pattern or practice claim, the EEOC bears the initial burden of making out a *prima facie* case of discrimination. *Int'l Broth. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977); *Ottaviani v. State Univ. of New York at New Paltz,* 875 F.2d 365 (2d Cir.1989). Because the EEOC is alleging a

pattern or practice of discrimination in violation of the ADA, it has "to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [has] to establish ... that [ ] discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.; Coser v. Moore,* 739 F.2d 746, 749 (2d Cir.1984). In general, pattern or practice discrimination is proved through a combination of statistical evidence and specific instances of discrimination. *See Int'l Broth. of Teamsters,* 97 S.Ct. at 1856; *Equal Employment Opportunity Comm'n. v. Chicago Miniature Lamp Works,* 947 F.2d 292, 299 (7th Cir.1991); *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 604 (2d Cir.1986).

This Court previously determined that the EEOC's charge and investigation did not adequately comply with 42 U.S.C. § 2000e–5(b) sufficient to support its allegation of a nationwide employment discrimination policy by Allied. Nov. 4, 1998 Memorandum—Decision & Order, at 7; *see Equal Employment Opportunity Comm'n. v. Shell Oil Co.,* 466 U.S. 54, 104 S.Ct. 1621, 1633, 80 L.Ed.2d 41 (1984). Thus, the instant litigation is limited to claims of a pattern or practice of discriminatory conduct at the Allied Selkirk terminal only.

█ In support of its contention of a pattern or practice of discriminatory conduct, the EEOC submitted affidavits of several Allied employees. These affidavits, however, are insufficient to raise a triable issue of fact regarding a discriminatory pattern of practice.

The EEOC submitted the affidavit of Charles Burgroff. Burgroff never worked at the Selkirk terminal and, therefore, his affidavit is irrelevant to the present litigation.

The EEOC also submitted the affidavit of James J. Cerone, the shop stewart for the Teamsters Union Local 294 in Selkirk. Cerone's affidavit does nothing other than restate the facts of this case; it is of no probative value regarding alleged discriminatory patterns or policies at Allied.

The EEOC also provided an affidavit from Frank Cimino. Cimino recounts an alleged discriminatory practice that occurred at Allied's Irwin, Texas terminal. Evidence of discrimination outside the Selkirk terminal is not relevant to this case. Although, Cimino did eventually relocate to the Selkirk terminal and suffered an injury that precluded him from working as a car hauler, he did not claim to be the victim of discriminatory practices by Allied. Rather, his affidavit states that "Allied would just routinely make it hard for injured workers to return to work because it would assume an employee couldn't work without really knowing the medical facts." Cimino. Aff., ¶ 15. Cimino's opinions as to Allied's motives are not sufficiently probative of a discriminatory pattern or practice to raise a triable issue of fact. *See e.g. Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395, 405–07 (2d Cir.1981).

The EEOC also presented the affidavit of Dave Dearstyne, a car hauler at the Allied Selkirk terminal who hurt his back and tore cartilage in his shoulder. Dearstyne's affidavit recounts the difficulties he had with Allied in obtaining light-duty work when his injury precluded him from being a car hauler. Dearstyne states that he persisted in seeking light-duty work from Allied, but was successful only after the intervention of the workers' compensation claim representative. Dearstyne's affidavit arguably is related to Allied's alleged failure to provide reasonable accommodations, although there is no indication whether he was a qualified individual with a disability, or whether a light-work position was available to accommodate Dearstyne at an earlier date.

The affidavit of Theodore Fraker, also submitted by the EEOC, actually supports Allied's position. Fraker states that he sustained a back injury in 1991 and, several years later, attempted to return to work at Allied. Fraker states that Lauda did not believe that Fraker could return to work, that Lauda stated he could not return to work unless he had no restrictions, but that Lauda, nonetheless, agreed to send him for a DOT physical. After a physical, Allied's physician permitted Fraker to return to work as a car hauler and, thus, Allied reinstated him.

Finally, the EEOC offers the Affidavit of Mark Mahar. Mahar injured his back in 1989. Mahar alleged that his personal physi-

cian released him for work as a car hauler in 1992. Lauda sent Mahar to Dr. Belmonte for a company physical. Mahar alleges that Lauda influenced Dr. Belmonte's decision not to give Mahar a DOTMEC. Mahar Aff., ¶ 7. There is no evidence, however, that Mahar took advantage of the CBA or 49 C.F.R. § 391.47 regarding resolution of conflicts of medical evaluations. Further, Mahar continues to state that in 1994, he received another note from his personal physician stating that he was physically able to return to work. Allied sent Mahar to Dr. Belmonte for a physical. After completing a medical exam, Dr. Belmonte issued a DOTMEC and Mahar ultimately was permitted to return to work.

This evidence, even when viewed cumulatively with Eissing's allegations, is insufficient to raise a triable issue fact of a pattern or practice of discrimination at the Selkirk terminal. *See Coser v. Moore*, 739 F.2d 746, 751 (2d Cir.1984). Further, the EEOC has not provided any statistical figures tending to support its assertion of a practice or pattern of discrimination at the Selkirk terminal. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 872 (2d Cir.1992); *Ingram v. Madison Square Garden Center, Inc.*, 709 F.2d 807, 810–11 (2d Cir.1983); *Lopez v. Metropolitan Ins. Co.*, 930 F.2d 157, 160 (2d Cir.1991). "[W]hen, as here, relevant statistics are lacking and the probative evidence of discrimination is confined ... to [few] individual incidents, subjective decisionmaking methods are not sufficient to establish a pattern or practice of discrimination; all that could be inferred is that their potential has been actualized in the same [few individual] cases." *See e.g. Ste. Marie*, 650 F.2d at 405–07. Thus, Allied is entitled to summary judgment. *See id.* (where relevant statistical evidence lacking, seven individual incidents of discrimination insufficient to demonstrate pattern or practice of discrimination); *Woodbury v. New York City Transit Auth.*, 832 F.2d 764, 771 (2d Cir.1987).

## III. CONCLUSION

For the foregoing reasons, Allied's motion for summary judgment is GRANTED and the Complaint against it is dismissed in its entirety. The Clerk of the Court is directed to close the file.

**IT IS SO ORDERED.**