Joseph C. KILCULLEN, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF TRANSPORTATION, Defendant.

No. 96–CV–2023 (LEK/RWS).

United States District Court, N.D. New York.

Jan. 19, 1999.

**136**

Office of Joseph Hein, Altamont, NY (Joseph Hein, of counsel), for Plaintiff.

Office of Attorney General, State of New York, Albany, NY, (Karen Marcoux Mankes, Ass't Attorney General, of Counsel) for Defendant.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

Plaintiff commenced this action alleging employment discrimination on the basis of disability in violation of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C.A. §§ 12101, et seq. (West 1995 & Supp.1998) and N.Y. Exec. Law §§ 290, et seq. (McKinney 1993) (hereinafter "Human Rights Law" or "HRL"). Presently before the Court is Defendant's motion for summary judgment and Plaintiff's cross-motion for partial summary judgment on the issue of whether he has a disability as that term is defined by the ADA and implementing regulations. This Court finds that it lacks subject matter jurisdiction due to the Defendant's immunity to suit in federal court under the Eleventh Amendment to the United States Constitution. Therefore, Defendant's motion for summary judgment is granted and Plaintiff's cross-motion is denied.

### I. Background

Plaintiff alleges that he suffers from epilepsy and a "learning disability." Compl. ¶ 9. He began employment with the Defendant on September 21, 1995 as a Highway Maintenance Trainee 2 ("HMT2"), assigned to work in the Clifton Park Department of Transportation ("DOT") Garage. HMT2s are hired initially under probationary status which continues for one year. While they have probationary status, employees can be fired without cause. Plaintiff was at all relevant times a probationary employee.

Plaintiff's employment responsibilities included the task of snow plowing. Between mid-December 1995 and early January 1996, Plaintiff was involved in four accidents while plowing. On February 28, 1996, Plaintiff was involved in a fifth accident. On February 29, 1996, Glen Decker ("Decker"), the general DOT foreman in Clifton Park, completed a probationary report recommending that the Plaintiff be terminated. Decker also made the subsequent decision to discharge the Plaintiff. Following his termination, Plaintiff brought this action alleging that his discharge was motivated by discrimination against the disabled.

### II. Discussion

Defendant argues that the Court lacks subject matter jurisdiction because of the Defendant's immunity to suit in federal court under the Eleventh Amendment. " 'Without jurisdiction the court cannot proceed at all in any case. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.' " *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). It is well-established that immunity under the Eleventh Amendment "affects our subject matter jurisdiction." *Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (citation omitted), *cert. denied,* 510 U.S. 1043, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994). "The Eleventh Amendment ... does not automatically destroy original jurisdiction," *Wisconsin Dep't. of Corrections v. Schacht,* 524 U.S. 381, ——, 118 S.Ct. 2047, 2052, 141 L.Ed.2d 364 (1998), and if a State fails to raise the question of Eleventh Amendment immunity, "a court can ignore it." *Id.* Here, however, the issue has been raised by the Defendant, and this Court must therefore address whether Eleventh Amendment immunity is applicable.

*A. Eleventh Amendment—General Principles*

The Eleventh Amendment to the United States Constitution provides that:

[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Under this amendment, a State "is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citation and internal quotations omitted). Further, state agencies are entitled to assert the same Eleventh Amendment immunity as the States themselves. *Id.* Here, Plaintiff has brought a suit in federal court against a state agency, and the requirements for application of Eleventh Amendment immunity are therefore present.

However, there are two ways that a state may be divested of its Eleventh Amendment immunity: (1) "a state may waive its immunity and agree to be sued in federal court," or (2) "Congress may abrogate a state's sovereign immunity through a statutory enactment . . . ." *Close v. State of N.Y.,* 125 F.3d 31, 36 (2d Cir.1997).

It is conceded by both parties that neither of these exceptions applies to the HRL claim. *See Mete v. New York State Office of Mental Retardation and Developmental Disabilities,* 984 F.Supp. 125, 134 (N.D.N.Y.1997) (McCurn, J.) (holding HRL claim against New York State was subject to Eleventh Amendment immunity). Plaintiff's HRL claim is therefore dismissed. The Court must determine whether an exception applies to the ADA claim. In particular, because there is no assertion that New York has waived immunity, the question presented is whether Congress has abrogated state immunity to claims brought pursuant to the ADA's employment anti-discrimination provision.

[4–6] Congress may not abrogate a state's Eleventh Amendment immunity unless it (1) " 'unequivocally express[s] its intent to abrogate the immunity' "; and (2) acts " 'pursuant to a valid exercise of power.' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252(1996) (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). To satisfy the first requirement, "Congress' intent to abrogate the States' immunity from suit must be obvious from 'a clear legislative statement.' " *Id.* (quoting *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). The ADA expressly provides that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202 (1994). The first requirement for abrogation is therefore clearly satisfied. Whether the law in question, and specifically the employment anti-discrimination provision, also constitutes a valid exercise of legislative power requires a more thoughtful analysis.

The validity of Congress' attempt to impose federal jurisdiction over the States depends on whether "the Act in question [was] passed pursuant to a constitutional provision granting Congress the power to abrogate [Eleventh Amendment immunity]." *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114. It is now established that Congress may abrogate the States' Eleventh Amendment sovereign immunity only by the power vested to it under § 5 of the Fourteenth Amendment. *Close,* 125 F.3d at 37–38 (citing *Seminole Tribe,* 517 U.S. at 63, 116 S.Ct. at 1128); *see also Mete,* 984 F.Supp. at 131 ("the only remaining authority for Congress to abrogate the States' immunity is through § 5 of the Fourteenth Amendment."). Section 5 states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5. The first provision of the Fourteenth Amendment states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The question before the Court is whether the ADA's employment anti-discrim-

ination provision is a valid exercise of Congress' power to enforce the Equal Protection Clause of the Fourteenth Amendment.

*B. Is ADA's Employment Anti–Discrimination Provision a Valid Exercise of Section 5 of the Fourteenth Amendment?*

All of the federal appellate courts and a majority of the district courts that have ruled on this issue have concluded that the ADA is a valid Fourteenth Amendment enactment. *See Kimel v. State Bd. of Regents*, 139 F.3d 1426, 1433 (11th Cir.), *reh'g en banc denied*, 157 F.3d 908 (1998), *petition for cert. filed*, 67 U.S.L.W. 3348 (U.S. Nov 13, 1998); *Coolbaugh v. State of La.*, 136 F.3d 430, 438 (5th Cir.1998), *reh'g en banc denied*, (May 11, 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Clark v. State of Calif.*, 123 F.3d 1267, 1270–71 (9th Cir.1997), *cert. denied, Wilson v. Armstrong*, —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 487 (7th Cir.1997); *Lamb v. John Umstead Hospital*, 19 F.Supp.2d 498 (E.D.N.C. Sept.1, 1998); *Muller v. Costello*, 997 F.Supp. 299, 304 (N.D.N.Y.1998) (Scullin, J.); *Martin v. State of Kan.*, 978 F.Supp. 992, 994–98 (D.Kan.1997); *Williams v. Ohio Dept. of Mental Health*, 960 F.Supp. 1276, 1280–83 (S.D.Ohio 1997); *Mayer v. University of Minn.*, 940 F.Supp. 1474, 1477–80 (D.Minn.1996); *Niece v. Fitzner*, 941 F.Supp. 1497, 1503–04 (E.D.Mich.1996). However, a number of appellate and district court judges have come to the opposite conclusion. *See Coolbaugh*, 136 F.3d at 439–442 (J. Smith, dissenting); *Kimel*, 139 F.3d at 1449 (J. Cox, concurring in part and dissenting in part); *Garrett v. Board of Trustees of University of Ala. in Birmingham*, 989 F.Supp. 1409 (N.D.Ala.1998); *Brown v. North Carolina Div. of Motor Vehicles*, 987 F.Supp. 451 (E.D.N.C.1997); *Nihiser v. Ohio E.P.A.*, 979 F.Supp. 1168, 1170–76 (S.D.Ohio 1997); *cf.*

*McGregor v. Goord*, 18 F.Supp.2d 204, 209 (N.D.N.Y.1998) (McAvoy, C.J.) (concluding that Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq., was not a proper exercise of Congress' § 5 power).[1] After considering the controlling precedents, this Court finds that the minority position is the correct one.

The Court is guided principally by *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The Supreme Court held in *Boerne* that the Religious Freedom Restoration Act of 1993 ("RFRA") was not a valid enactment under § 5 of the Fourteenth Amendment. RFRA had been passed in reaction to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that where a governmental burden on the exercise of religion is the "incidental effect of a generally applicable and otherwise valid provision," the First Amendment's guarantee of free exercise of religion has not been offended. *Id.* at 878, 110 S.Ct. 1595. With RFRA, Congress established a different standard controlling the validity of state or local actions that affect the exercise of religion. RFRA prohibited government from "substantially burden[ing]" a person's exercise of religion unless the government could demonstrate that the burden was "in furtherance of a compelling governmental interest" and was "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000bb–1 (West Supp.1998).

In reviewing whether RFRA was a valid enactment under § 5 of the Fourteenth Amendment, the Court acknowledged that " § 5 is 'a positive grant of legislative power' to Congress," *Boerne*, 521 U.S. at ——, 117 S.Ct. at 2163, and that under that grant, the scope of Congress' legislative authority was broad:

---

1. The Eighth Circuit is emblematic of this conflict. Upon hearing argument *en banc* on the issue of ADA abrogation of Eleventh Amendment immunity, the Circuit split evenly and thus affirmed the district court without opinion. *See Autio v. AFSCME, Local 3139*, 157 F.3d 1141 (8th Cir.1998). It appears, then, that the Eighth Circuit cannot resolve this issue with its current

twelve members. *Compare Alsbrook v. City of Maumelle, Ark.*, 156 F.3d 825 (8th cir.1998) (upholding ADA abrogation), *vacated on reh'g en Banc*, (Nov. 12, 1998) *with Humenansky v. Regents of University of Minnesota*, 152 F.3d 822, 826–27 (8th Cir.1998), *reh'g en banc den.*, Nov. 3, 1998 (Age Discrimination in Employment Act was invalid exercise of § 5 enforcement power).

Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against state denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Id.* (quoting *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879)). However, the Court also held that Congress' enforcement power under § 5 of the Fourteenth Amendment "'is not unlimited.'" *Id.* (quoting *Oregon v. Mitchell*, 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970)). The critical limitation, the Court found, is that Congress can pass legislation which "enforc[es]" the rights protected by the Fourteenth Amendment as defined by governing judicial precedent, but cannot pass legislation which changes those rights or otherwise declares what the Fourteenth Amendment rights are:

The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation.

*Id.* at 2164.[2]

The Court clarified that valid enforcement legislation is restricted to "measures that

remedy or prevent unconstitutional behavior ...." *Id.*[3] Further, the Court held that not every measure which addresses some unconstitutional behavior is valid Fourteenth Amendment legislation. The Court explained that "[t]here must be a congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end." *Id.* Under this requirement,

[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser harm.

*Id.* at ——, 117 S.Ct. at 2169. The Court also stated that where a Congressional enactment singles out for prohibition a particular type of law or conduct which is not facially unconstitutional, there must be "reason to believe that many" instances of the law or conduct "have a significant likelihood of being unconstitutional." *See Boerne*, 521 U.S. at ——, 117 S.Ct. at 2170. The Court concluded that RFRA was not a valid enactment under the Fourteenth Amendment because it was "not designed to identify and counteract state laws likely to be unconstitutional ...." *Id.* at ——, 117 S.Ct. at 2171.

■■■ Drawing on the analysis of *Boerne*, this Court finds that, to decide whether a measure is enforcing the Fourteenth Amendment, a court must first determine the relevant constitutional right being addressed by the legislative measure and then determine whether the measure is a congruent and proportional response to violations of that right. A measure may fail the test of congruence and proportionality (a) if there is no reason to believe that the

---

**2.** As a matter of policy, the Court found the distinction justified by the necessity of maintaining "the traditional separation of powers between Congress and the Judiciary." *Boerne*, 521 U.S. at ——, 117 S.Ct. at 2166; *see also Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 178, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.") In addition, "[i]f Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be superior paramount law, unchangeable by ordinary [i.e. legislative] means." *Boerne, id.*

**3.** As another court has expressed it:

[t]he principal object of the legislation must be to address rights that are judicially recognized; Congress can prohibit conduct that is not unconstitutional, but [this prohibition] must be nothing more than incidental to a primary effort of prohibiting conduct that is unconstitutional.

*Reynolds v. Alabama Dept. of Transp.*, 4 F.Supp.2d 1092, 1108 (M.D.Ala.1998).

measure is significantly likely to address many instances of unconstitutional conduct or (b) if the mandate or prohibition of the measure is significantly disproportionate to the constitutional harm. *Cf. Reynolds v. Alabama Dept. of Transp.*, 4 F.Supp.2d 1092, 1108–09 (M.D.Ala.1998) ("Two of the factors that should inform ·the court in assessing whether there is congruence and proportionality are (a) whether the legislation that prohibits conduct that is not itself unconstitutional is incidental to a primary effort of prohibiting conduct that is unconstitutional; and (b) whether, assuming (a) is satisfied, Congress has adopted measures that correspond to the magnitude of the evil presented."). Applying this analysis, the Court finds that the ADA's employment anti-discrimination provision is not a congruent and proportional response to violations of the equal protection rights of the disabled.

*C. The Relevant Constitutional Right*

The constitutional rights of the disabled under the Equal Protection Clause were addressed by the Supreme Court in *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In that case, the Court rejected the argument that state action involving persons with mental disabilities and challenged as violating the Equal Protection Clause should be reviewed under heightened scrutiny. *Id.* at 446, 105 S.Ct. 3249. Instead, it held that such state action was subject only to rational-basis scrutiny. *Id.*

■■■ Under this standard, state action which has a disparate impact does not violate the Equal Protection Clause "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *see also Romer v. Evans*, 517 U.S.

620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (under rational basis review, a law "will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group ...."). This relationship is "not difficult to establish" since the rational relationship need only be " 'at least debatable.' " *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 881, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (quoting *Western & Southern Life Ins. Co. v. State Board of Equalization of California*, 451 U.S. 648, 674, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981)). Further, the legitimate purpose in question need not be specified; state action will be upheld if there is any "conceivable basis which might support [the action]." *Heller, id.*[4]

■■■ It has been subsequently established that *City of Cleburne* set the applicable standard for reviewing conduct involving all forms of disability. *See Coolbaugh*, 136 F.3d at 430 n. 1 (holding that *Cleburne* 's reasoning applies to both physical and mental disabilities and collecting cases); *Lussier v. Dugger*, 904 F.2d 661, 671 (11th Cir.1990) ("*Cleburne* thus clearly indicates that legislation affecting persons suffering from a physical handicap ... is to be judged, in the face of an equal protection challenge, in terms of the 'rationally related,' and not a higher, standard."); *Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094, 1131–32 (S.D.N.Y.1997) (Sotomayor, J.) (finding that *City of Cleburne* made it "clear that the .rational basis standard was the appropriate standard of review under the Equal Protection Clause for reviewing purported instances of discrimination against handicapped individuals."), *aff'd in part, vacated in part on other grounds*, 156 F.3d 321 (1998); *see also Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 825 (2d Cir.1996) (applying rational basis test to claims of dis-

4. It has been suggested that *City of Cleburne* actually imposed a heightened form of rational-basis scrutiny on state action involving the disabled. *See Brennan v. Stewart*, 834 F.2d 1248, 1259 (5th Cir.1988). However, the Supreme Court has subsequently confirmed that *City of Cleburne* established the traditional level of scrutiny for claims against the disabled. *See Heller*, 509 U.S. at 321, 113 S.Ct. 2637 (reviewing tradi-

tionally deferential standard, and finding that *City of Cleburne* did not "purport to apply a different standard of rational-basis review from that just described."); *see also Bartlett v. New York State Bd., of Law Examiners*, 970 F.Supp. 1094, 1135 (S.D.N.Y.1997) (Sotomayor, J.) ("this Court should apply the traditional rational basis standard to claims brought by the disabled ....").

abled persons that denial of funding for out-of-state care violated equal protection), *cert. denied,* 520 U.S. 1239, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997). Thus, the relevant right of persons with disabilities, the violation of which creates a constitutional injury, is the right to be free of government action which is not rationally related to any legitimate governmental purpose. *See Mills v. Maine,* 118 F.3d 37, 47 (1st Cir.1997) (under rational review, Congress "is limited to the elimination of arbitrariness or the effects of arbitrary government action, and [may not] prohibit or otherwise target reasonable state decisions or practices.").

Some courts have argued that the standard of review applied by the Supreme Court in *City of Cleburne* does not establish the boundaries of the right which Congress may enforce. In support of this assertion, there appear to be three principle arguments. The first argument is that Congress may prohibit constitutional as well as unconstitutional conduct, and thus is not restricted to prohibiting conduct that is unconstitutional under *City of Cleburne.* The second argument is that Congress may determine that conduct which would be upheld under rational basis review nevertheless violates the Equal Protection Clause. The third argument is that, based on the findings of the ADA, the courts should reconsider what standard of review to apply to conduct involving disabled persons and replace the current rational basis review with some level of heightened scrutiny. This Court finds that these arguments do not provide persuasive reasons for concluding that the relevant right is not defined by *City of Cleburne.* Therefore, after addressing each argument in turn, this Court will determine whether the employment anti-discrimination provision is a congruent and proportional response to conduct which is unconstitutional under rational basis scrutiny.

*1. Congress may prohibit constitutional conduct*

█ First, in arguing for the right of Congress to prohibit conduct not barred under the judiciary's standards of review, courts rely upon the statement in *Boerne*

that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Boerne,* 521 U.S. at ——, 117 S.Ct. at 2163. *See, e.g., Kimel,* 139 F.3d at 1438, 1441; *Autio,* 140 F.3d at 805. However, this language does not mean that Congress, having addressed arguably unconstitutional behavior, is then free to impose any mandate it chooses regardless of whether that mandate addresses the constitutional violations to be remedied or prevented. Rather, the prohibition of constitutional conduct must be "in the process" of enforcing a constitutional right. *Boerne, id.*

The Supreme Court provided as an example the Voting Rights Act's prohibition on state use of literacy tests as a voting restriction. *Boerne,* 521 U.S. at ——, 117 S.Ct. at 2167. In that instance, evidence in the legislative record demonstrated "the pervasive discriminatory—*and therefore unconstitutional*—use of literacy tests." *Id.* (emphasis added). Because a ban on such tests was likely to address many instances of unconstitutional behavior, Congress could permissibly legislate a prohibition on such tests tailored to the cases significantly likely to be unconstitutional.

Whether a measure prohibiting a type of conduct is sufficiently tailored to violations of a constitutional right depends on the breadth of the constitutional right. Thus, *Boerne*'s grant to Congress of a right to legislate with some overbreadth does not obviate the need to determine the scope of the underlying right nor does it suggest that Congress has any power, pursuant to section 5 of the Fourteenth Amendment, to legislate measures that affect conduct primarily outside the scope of that right. Reliance upon this overbreadth allowance to conclude that Congress was free to prohibit conduct involving the disabled regardless of whether it is constitutional or not is therefore misplaced. The Court must still look to the rational basis standard of review to determine whether the ADA's employment anti-discrimination provision is sufficiently tailored to acts which would fail the rational basis test.

## 2. Judicial standards of review not binding on Congress

■ Courts have asserted that judicial standards of review are simply inapplicable in defining the boundaries of Congress' § 5 enforcement power. *See Clark,* 123 F.3d at 1271 ("The State does not explain why the Court's choice of a level of scrutiny for purposes of judicial review should be the boundary of the legislative power under the Fourteenth Amendment, nor have we found any case to so hold."). To the extent that these courts are only asserting that Congress may prohibit some constitutional conduct in the process of prohibiting unconstitutional conduct, the argument is the same as that addressed above. However, courts have also argued that Congress is not restricted by judicial standards of review in determining the initial question of what conduct is constitutional. *See Lamb,* 19 F.Supp.2d at 505 (arguing that " 'Congress is free to assess the constitutionality of state action that would be shielded from heightened judicial scrutiny by the application of the rational basis test' ") (quoting Elizabeth Welter, *The ADA's Abrogation of Eleventh Amendment State Immunity as a Valid Exercise of Congress's Power to Enforce the Fourteenth Amendment,* 82 Minn. L.Rev. 1139, 1161 (April 1998)); *Martin,* 978 F.Supp. at 995; *Williams,* 960 F.Supp. at 1281–82. In support of this assertion, the courts in *Martin* and *Williams* noted the following language in *City of Cleburne:*

> Section 5 of the [Fourteenth] Amendment empowers Congress to enforce this mandate [of the Equal Protection Clause], but *absent controlling congressional direction,* the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection.

*City of Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249 (emphasis added). These courts argue that where Congress does provide direction by establishing a higher standard of review, this direction supersedes the judicial standard. *See Martin,* 978 F.Supp. at 995; *Williams,* 960 F.Supp. at 1281.

Several circuit courts have held, however, that the applicable judicial standard of review establishes the limit of the Equal Protection right which Congress may enforce. *See Abril v. Com. of Virginia,* 145 F.3d 182, 188 (4th Cir.1998) (holding that the "limited measure of protection [granted by rational-basis scrutiny] therefore defines the end 'comprehended by' the Equal Protection Clause . . . for guarding against such a non-core inequality of treatment and, accordingly, the limited power of Congress acting under Section 5 to eliminate or prohibit the inequality."); *Mills v. State of Maine,* 118 F.3d 37, 47 (1st Cir.1997) ("Congress' section five enforcement power, as it pertains to the Equal Protection Clause in cases not involving suspect or quasi-suspect classes or fundamental interests, is limited to the elimination of arbitrariness or the effects of arbitrary government action, and does not permit Congress to prohibit or otherwise target reasonable state decisions or practices."); *see also Goshtasby v. Bd. of Trustees of Univ. of Ill.,* 141 F.3d 761, 772 (7th Cir.1998) (upholding age discrimination legislation where it prohibited conduct found to be "unconstitutional even under a rational-basis standard of review.").

■ More importantly, the application of judicial standards of review to determine the binding scope of a constitutional right, regardless of the presence or absence of Congressional direction, is required by *Boerne. Boerne*'s central holding was that Congress "has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *See* 521 U.S. at ——, 117 S.Ct. at 2164. If one assumes that Congress is not restricted by judicial standards of review in determining what conduct is unconstitutional, then Congress may look at conduct which a court would uphold as constitutional and determine that it is in fact unconstitutional. Thus, Congress could find that actions which were constitutional under the rational basis test nevertheless violate the equal protection rights of the disabled. *See Lamb,* 19 F.Supp.2d at 505. However, in doing so, Congress would clearly be exercising "the power to determine what constitutes a constitutional violation" contrary to the mandate of *Boerne. Id.* at ——, 117 S.Ct. at 2164. *See* Note, *Section 5 and the Protection of Nonsuspect Classes After City of*

*Boerne v. Flores*, 111 Harv. L.Rev. 1542, 1558 (April 1998) (stating that attempt to "extend suspect class protection to the disabled :... surely is substantive within the meaning of *Boerne*."). Indeed, the Court in *Boerne* struck down RFRA precisely because it imposed a higher standard of review on state action than that which had been declared to be applicable by the Supreme Court, with the result that "[l]aws valid under [the applicable judicial standard] would fall under RFRA without regard to whether they [were unconstitutional.]". *Boerne*, 521 U.S. at ——, 117 S.Ct. at 2171. Thus, *Boerne* directly contradicts the "superceding congressional direction" theory of the *Martin* and *Williams* courts. This Court concludes that under *Boerne*, the boundaries of the right granted to persons with disabilities under the Equal Protection Clause is defined by the level of judicial scrutiny applicable to claims alleging discrimination on the basis of disability, i.e. the rational basis test.[5]

### 3. ADA findings support revision of standard of review

 A third, related argument is that the ADA's finding that the disabled are "a discrete and insular minority ... who have been ... subjected to a history of purposeful unequal treatment," 42 U.S.C. § 12101(7)(1994), is an invitation for the judiciary to revisit the question of what standard of review to apply to state action involving the disabled. In *Heller v. Doe by Doe, supra*, the Supreme Court expressly left open the possibility that it might reconsider whether the disabled are a suspect or quasi-suspect class. 509 U.S. at 319, 113 S.Ct. 2637; *see also id.*, 509 U.S. at 335 n. 1, 113 S.Ct. 2637 (Souter, J., dissenting). Although this argument does not run afoul of *Boerne*, this Court must nevertheless reject it based on another recent Supreme Court case, *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). There, the Supreme Court "reaffirm[ed] that 'if a precedent of

this Court has direct application in a case, yet appears' to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Id.*, 521 U.S. at ——, 117 S.Ct. at 2017 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 485, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). There is no reason to believe that courts are freer to reject Supreme Court precedent based on pronouncements of Congress than based on pronouncements of the Supreme Court itself. *See Bartlett*, 970 F.Supp. at 1135 (*Agostini* rule "constrains my ability to determine whether the ADA has, or should, effect a change in the level of scrutiny afforded the disabled."); *see also Boerne*, 521 U.S. at ——, 117 S.Ct. at 2172 ("When the political branches of the Government act against the background of a judicial interpretation already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed."). In this case, the Court finds that *City of Cleburne* is directly applicable, and it is left to the Supreme Court to determine whether the standard it established should be altered. Until then, the traditional rational basis standard of review establishes the limits of the applicable equal protection right. The Court must therefore determine whether the ADA's employment anti-discrimination provision is a congruent and proportional response to violations of the right to be free of government action which is not rationally related to any legitimate governmental purpose.

### B. Congruence and proportionality of the ADA's Employment Anti–Discrimination Provision

In *Boerne*, the Supreme Court looked both at the face of the statute and the legislative

---

**5.** It must be emphasized that this Court's argument is not that Congress may not prohibit constitutional conduct, but that it may only prohibit conduct which is at least significantly likely to be unconstitutional, and that to determine whether conduct satisfies this test, one must apply the applicable standards of review, as was done in *Boerne*, 521 U.S. at ——, 117 S.Ct. at 2171. *See*

*Coolbaugh*, 136 F.3d at 439 (Smith, J., dissenting) (stating that his argument against the validity of the ADA was not that Congress could not prohibit constitutional conduct but that "Congress does not have the power to tell us what is, or is not, constitutional conduct in the first place.")

history to determine whether either supported the conclusion that RFRA was a con-gruent and proportional response to violations of the Fourteenth Amendment. *See id.* at ——, 117 S.Ct. at 2169–71. This Court has considered the terms of the anti-discrimination provision and the legislative findings and history associated with it and concludes that, as in the case of RFRA, neither supports the conclusion that the employment anti-discrimination provision is validly enacted pursuant to section 5 of the Fourteenth Amendment.

### 1. Facial Validity of the Provision

The ADA prohibition against employment discrimination against the disabled is codified at 42 U.S.C. § 12112 (1994), subsection (a) of which reads in part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees ...." *Id.* § 12112(a). Under § 12112, discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A). The requirement of "reasonable accommodation" is also embedded in the definition of a "qualified person with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (1994).

This Court notes that Plaintiff's claim does not appear to rest on the obligation under the ADA to provide a "reasonable accommodation." Rather, Plaintiff asserts that he was not treated the same as similarly situated non-disabled employees. The Court must nevertheless determine the validity of the reasonable accommodation requirement because the validity of the ban on discriminatory treatment cannot be upheld independant of the obligation to accommodate. For an aspect of a statute to be sepa-

rately analyzed and upheld, it must "enjoy[ ] a textual manifestation separate from" the invalid portion of the statute. *Reno v. American Civil Liberties Union,* 521 U.S. 844, ——, 117 S.Ct. 2329, 2350, 138 L.Ed.2d 874 (1997). The anti-discrimination provision under which Plaintiff brings his action incorporates the accommodation requirement both in the term "qualified individual with a disability" and the meaning of the word "discriminates." *See* 42 U.S.C. § 12112(a) (1994). Thus, the aspect on which Plaintiff rests his claim has no separate textual manifestation from the accommodation requirement. Indeed, the House Report accompanying the ADA stated that the "reasonable accommodation requirement is *central* to the non-discrimination mandate of the ADA." H.R.Rep. No. 101–485(III), 39 (1990), *reprinted at* 1990 U.S.C.C.A.N. 445, 462 (emphasis added). As a result, the constitutional validity under § 5 of the Fourteenth Amendment of the anti-discrimination provision as a whole depends on the validity of the accommodation requirement. This Court therefore must determine whether Congress, in requiring "reasonable accommodation," exceeded its authority under section 5 of the Fourteenth Amendment.

"Reasonable accommodations" include

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (1994). A disabled person needing such accommodation thus imposes costs, whether financial or administrative, which are not attendant to the employment of a non-disabled person. *See Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 138 n. 3 (2d Cir.1995) ("the requirement of reasonable accommodation anticipates that it may cost more to obtain that

level of performance from an employee with a disability than it would to obtain the same level of performance from a non-disabled employee.")[6]. A government has a legitimate interest in performing its functions in a cost-efficient manner, and accommodation requires the employer to absorb additional cost without necessarily receiving any additional benefit. *See Borkowski,* 63 F.3d at 138 n. 3 (reasonable accommodation does not "require that the *employer* receive a benefit commensurate with the cost of the accommodation.") (emphasis added). Thus, the decision not to accommodate is rationally related to the interest in cost-efficiency. *See Welsh v. City of Tulsa, Okl.,* 977 F.2d 1415, 1420 (10th Cir.1992) (holding that "an employer does not act irrationally by choosing an applicant who does not need any special accommodations over one who does.") Because the failure to accommodate survives rational basis review, there is no "significant likelihood" evident that the accommodation requirement will prevent or remedy many instances of unconstitutional behavior and thus, on its face, the requirement is not a congruent and proportional response to unconstitutional discrimination under *Boerne.* Instead, the imposition of an entitlement to reasonable accommodation creates a new substantive right outside the scope of the Fourteenth Amendment.

One court has argued that "[t]he affirmative obligations imposed by the ADA do not create unfair entitlements for the disabled, but instead address situations that are inherently discriminatory." *Martin,* 978 F.Supp. at 997. However, it is well-established that the Equal Protection Clause of the Fourteenth Amendment does not forbid situations which are merely "inherently discriminatory" but only conduct which is intentionally discriminatory. *See Baker v. Pataki,* 85 F.3d 919, 926 (2d Cir.1996); *see also Soberal–Perez v. Heckler,* 717 F.2d 36, 42 (2d Cir. 1983) (holding that "[t]o establish [the requisite] intentional discrimination, a plaintiff must show that the decision maker ... selected or reaffirmed a particular course of

action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group.") (citation and internal quotations omitted).

The court in *Martin* also argued that " '[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.' " 978 F.Supp. at 997 (quoting *Autio,* 968 F.Supp. at 1372) (citation and internal quotation omitted). However, "[t]he Equal Protection Clause of the Fourteenth Amendment to the United States Constitution 'is essentially a direction that all persons similarly situated should be treated alike.' " *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995) (quoting *City of Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249). Conversely, "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *United States v. Whiton,* 48 F.3d 356, 358 (8th Cir.) (citation and internal quotations omitted), *cert. denied., Whiton v. U.S.,* 516 U.S. 886, 116 S.Ct. 227, 133 L.Ed.2d 156 (1995). Thus, "[t]he threshold requirement of an equal protection claim is a showing that the government discriminated among groups." *Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *see also Quill v. Vacco,* 80 F.3d 716, 725 (2d Cir.1996) ("[t]he Constitution does not require things which are different in fact ... to be treated in law as though they were the same.") (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citation and internal quotations omitted)), *rev'd on other grounds, Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). Because of their need for accommodation, "the handicapped typically are not similarly situated to the nonhandicapped ...." *Alexander v. Choate,* 469 U.S. 287, 298, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Therefore, the argument that the failure to treat persons with disabilities in a dissimilar fashion itself constitutes a violation of the Equal Protection Clause must be re-

---

6. This case deals with the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701–796. It is well-established, however, that case law involving the Rehabilitation Act may be relied upon to

interpret equivalent terms in the ADA. *See Castro v. Local 1199,* 964 F.Supp. 719, 724 n. 5 (S.D.N.Y.1997); *Hope v. Cortines,* 872 F.Supp. 14, 21 (E.D.N.Y.1995), *aff'd,* 69 F.3d 687 (1995).

jected.[7]

In sum, the Court finds that rational basis scrutiny establishes the extent of the constitutional right which Congress may enforce, and that the failure to accommodate is rationally related to a legitimate governmental purpose. Thus the accommodation requirement, on its face, does not represent a congruent and proportional response to violations of the rights of the disabled to equal protection under the Fourteenth Amendment.

### 2. Legislative findings

In *Boerne,* the Supreme Court looked at the Congressional record for evidence that RFRA was a congruent and proportional response to the constitutional injury to be remedied or prevented. *See id.* at ——, 117 S.Ct. at 2169; *see also Reynolds,* 4 F.Supp.2d at 1108 (finding that legislative record was relevant only insofar as it helped to establish "a substantial hook or tie to an effort—and a primary effort at that—to redress unconstitutional conduct ...."). Chiefly, the Supreme Court looked at whether the evidence indicated that facially constitutional conduct was unconstitutional in practice. *See Boerne* at ——, 117 S.Ct. at 2167 (finding that ban on literacy tests was justified where "evidence in the record reflect[ed] the subsisting and pervasive discriminatory-and therefore unconstitutional-use of literacy tests"). Thus, statutory findings or legislative history are relevant in this case insofar as they demonstrate that it is significantly likely that many cases of the failure to accommodate are unconstitutional in practice. Because the equal protection right of the disabled is defined by rational basis review, this would require evidence from which Congress could have reason to believe that the failure to accommodate will often have no rational relation to any legitimate purpose. The Court finds such evidence lacking. Alternatively, the Court concludes that, at best, the record supports the validity of an obligation to make minor cost accommodations only. However,

the ADA's obligation is significantly broader than a requirement to make minor cost accommodations, and thus would still fail the test of proportionality.

 It is noted that other courts have, in upholding the ADA, looked to a different kind of evidence: evidence not of the objective irrationality of the failure to accommodate but of subjectively discriminatory intent. However, subjective intent is not relevant to demonstrating unconstitutionality under the rational basis test. This Court also concludes that even if intent were relevant, the record does not support the conclusion that the failure to accommodate is motivated by purposeful discrimination.

#### a) Evidence that failure to accommodate is irrational

 In reviewing the legislative record, the Court notes that the record need only provide a "reason to believe" that a type of conduct is significantly likely to be unconstitutional. *Boerne,* 521 U.S. at ——, 117 S.Ct. at 2170. *See also City of Rome v. United States,* 446 U.S. 156, 177, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (upholding validity of enactment prohibiting changes in voting practices or procedures where "Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact."). However, a "reason to believe" is clearly not an open door policy toward unsubstantiated speculation. Rather, where the reason is not evident on the face of the statute, it must be apparent from the record on which Congress relied. *See, e.g., Boerne,* 521 U.S. at ——, 117 S.Ct. at 2169.

 Thus, although the term "rational basis" is used by the courts in reviewing whether Congress has validly exercised its enforcement power under the Fourteenth

---

7. The text of the ADA itself appears to concede as much. In the "Findings and Purpose" section, the drafters admit that discrimination against the disabled will typically not be considered actionable as a violation of the Equal Protection

Clause: "individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination." 42 U.S.C. § 12101(a)(4) (1994).

Amendment, *see, e.g., City of Rome, supra,* the test is not applied in a fashion identical to the traditional rational-basis standard of scrutiny. Under the latter, there is "no obligation to produce evidence to sustain the rationality of a statutory classification" and an enactment may be "based on rational speculation unsupported by evidence or empirical data." *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. However, as noted, the Supreme Court has repeatedly upheld Congressional enactments based on evidence and empirical data and found RFRA invalid in part because of the lack of such data.

Thus, the standard imposed by requiring a "reason to believe" or a "rational basis" in the context of reviewing Congressional exercise of its power to enact legislation is closer to the standard of review applied to judgments made by Congress which are reviewed for validity under the First Amendment. In such cases, "courts must accord substantial deference to the predictive judgments of Congress," *Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, ——, 117 S.Ct. 1174, 1189, 137 L.Ed.2d 369 (1997) (citation and internal quotations omitted), but must be satisfied that "Congress has drawn reasonable inferences based on substantial evidence." *Turner,* —— U.S. at ——, 117 S.Ct. at 1189.

In previous Supreme Court cases determining whether a prohibition of a type of conduct is justified as an enforcement of the Fourteenth Amendment, "substantial evidence" was provided by findings that the conduct to be prohibited has been found unconstitutional. *See Boerne,* 521 U.S. at ——, 117 S.Ct. at 2168–69; *City of Rome,* 446 U.S. at 177, 100 S.Ct. 1548 (upholding prohibitions of disparate impact voting practices based in part on "demonstrable history of intentional racial discrimination *in voting*") (emphasis added); *see also South Carolina v. Katzenbach,* 383 U.S. 301, 329, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (upholding prohibition on

voting eligibility tests in 42 U.S.C. § 1973b based on "reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act.")[8]; *cf. U.S. v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 1659–60, 131 L.Ed.2d 626 (1995) (Breyer, J., dissenting) (arguing that Congress could have rationally found that possession of guns near public schools has substantial impact on interstate commerce where reports, hearings and other evidence established both that guns "significantly undermine the quality of education" and that education has significant effect on interstate and foreign commerce). The Court noted in *Boerne* that in previously upholding the prohibition on literacy tests, it had focused not merely on the presence of general racial discrimination in society but on Congressional findings that the literacy tests themselves were products of such discrimination. *Boerne,* 521 U.S. at ——, 117 S.Ct. at 2167 (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 333–34, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).

Similarly, in reviewing the legislative record of RFRA, the Supreme Court found that it "lack[ed] examples of modern instances of generally applicable laws passed because of religious bigotry." *Boerne, id.* at ——, 117 S.Ct. at 2169. The laws which were subject to the obligations of RFRA would only be unconstitutional if they were "enacted with the . . . object of targeting religious beliefs and practices," *id.* at ——, 117 S.Ct. at 2168. Because the Congressional record lacked examples of conduct addressed by RFRA which would be unconstitutional, there was not a sufficient reason to believe that RFRA's prohibition was significantly likely to address many instances of unconstitutional conduct.

▆▆▆ Because accommodation on its face imposes additional costs on the employer, the refusal to make such accommodations could not be found irrational unless those costs

---

**8.** In *South Carolina,* the Supreme Court stated: "Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot." The record shows that in most of the states covered by the Act, including South Carolina, various tests and devices have been instituted with the purpose of disenfranchising

Negroes, have been framed in such a way as to facilitate this aim, and have been administered in a discriminatory fashion for many years. Under these circumstances, *the Fifteenth Amendment has clearly been violated.*
*Id.,* 383 U.S. at 333–34, 86 S.Ct. 803 (emphasis added) (citations omitted).

were clearly outweighed by the benefits of making the accommodation. *See Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 881, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (rational relationship need only be " 'at least debatable.' ") (citation omitted). There is some evidence in the legislative record that the costs of accommodation will frequently be minor. For example, Congress received testimony that "the majority of accommodations for employees with disabilities are less than \$50." Testimony of Nikki Van Hightower, Arnold & Porter (hereinafter "A & P") ADA Comm. Print 1990(28B), *1443 (available on Westlaw). Congress also received testimony that employers making accommodations would receive the advantages of a broader labor pool and that accommodation was "good business." H.R.Rep. No. 101–485(II), 44–45 (1990), *reprinted at* 1990 U.S.C.C.A.N. 303, 326–27. However, the record lacks even one cited instance where a refusal to accommodate was actually found to be unconstitutionally irrational. Nor does the record provide any specific cases where the benefits resulting from an accommodation were clearly greater than the costs. The testimony that employers would receive some benefit from a larger labor pool is entirely speculative as to whether that benefit has exceeded the costs of accommodation in a significant number of actual cases. Because the rationality of the employer's refusal to accommodate need only be "debatable" to survive constitutional review, and because the record lacks the examples of unconstitutional behavior found critical in the Supreme Court's jurisprudence, the Court concludes that the record does not provide a reason to believe that refusals to make minor cost accommodations are significantly likely to be unconstitutional.

Moreover, even assuming that the record provides a sufficient basis for the conclusion that refusals to make minor cost accommodations are significantly likely to be irrational, the reasonable accommodation requirement still fails the test of congruence and proportionality. As noted above, proportionality requires that the strength of the measure not be significantly disproportionate to the constitutional harm. *See Boerne,* 521 U.S. at ——, 117 S.Ct. at 2169 (holding that strong measures "appropriate to address one harm may be an unwarranted response to another, lesser harm"); *Reynolds v. Alabama Dept. of Transp.,* 4 F.Supp.2d at 1108–09 (finding that *Boerne* requires that Congress has "adopted measures that correspond to the magnitude of the evil presented"). In this case, reasonable accommodation imposes an obligation significantly greater than that of making minor cost accommodations. Rather, it will require a State to make accommodations of significant cost.

The House of Representatives made it clear in its Report that the obligation was not intended to be limited to accommodations imposing a small burden when it explained the two reasons for the use of the term "undue hardship" in the ADA to describe the limits of the accommodation requirement:

> First, a definition of undue burden was included in order to distinguish it from the definition of "readily achievable" in title III governing the requirement to alter existing public accommodations. Readily achievable means "easily accomplishable and able to be carried out without much difficulty or expense." The duty to provide reasonable accommodation, by contrast, is a much a higher standard than the duty to remove barriers in existing buildings (if removing the barriers is readily achievable) and creates a more substantial obligation on the employer.

> Second, a definition was included in order to distinguish the duty to provide reasonable accommodation in the ADA from the Supreme Court's interpretation of title VII in *TWA v. Hardison,* which held that accommodations to religious beliefs need not be provided if the cost was more than *de minimis* to the employer.

> Thus, the definition of "undue hardship" in the ADA is intended to convey a significant, as opposed to a *de minimis* or insignificant, obligation on the part of employers.

H.R.Rep. No. 101–485(III), 40 (1990), *reprinted at* 1990 U.S.C.C.A.N. 445, 463; *see also Lyons v. Legal Aid Soc.,* 68 F.3d 1512, 1517 (2d Cir.1995) ("an accommodation may not be considered unreasonable merely be-

cause it requires the employer 'to assume more than a *de minimis* cost' "). Indeed, the only categorical limit on the obligation to accommodate appears to be cases of truly extraordinary cost. *See Borkowski*, 63 F.3d at 138 ("we would, not, for example, require an employer to make a multi-million dollar modification for the benefit of a single individual with a disability . . . .").

Moreover, the obligatory costs of reasonable accommodation to a state will likely be even higher than for a private employer. The primary upper limit placed on cost is that the employer is not required to make a reasonable accommodation if it can show that such accommodation imposes an "undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994).[9] The term "undue hardship" "means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." *Id.* § 12111(10)(A). These "factors" include

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities

42 U.S.C. § 12111(10)(B) (1994). Because "undue hardship" focuses primarily on the financial resources of the entity involved, it has much less application to a government which "can raise taxes in order to finance any accommodations that it must make . . . ." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 543 (7th Cir.1995); *cf. Nelson v. Thornburgh*, 567 F.Supp. 369, 380 (finding that required accommodation was not undue hardship in view of federal department's $300,000,000.00 budget). Focus on the size of the entity or the number of its facilities, where that entity is a state government, only reinforces the conclusion that states will be subject to substantial cost obligations under the accommodation provision. Thus, even if one accepts the argument that a failure to make accommodations of minor costs is likely to be objectively irrational, the reasonable accommodation remedy is significantly disproportionate to that constitutional harm.

This lack of focus is unconstitutional under *Boerne*. In that case, the Court held that "[r]emedial legislation under § 5 'should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against,' " *Boerne*, 521 U.S. at ——, 117 S.Ct. at 2170 (citation omitted). RFRA was "not so confined," the Court found, in that it covered "every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. . . ." *Id.* The Court contrasted it with the Voting Rights Act, which, by the application of restrictions on

---

9. The terms of the statute include two limits on the duty to accommodate: an accommodation must both be "reasonable" and not impose on the employer an "undue hardship." 42 U.S.C. § 12112(5)(A) (1994). According to the Second Circuit, "reasonableness" requires the plaintiff to suggest an accommodation whose costs "facially, do not clearly exceed its benefits." *Stone v. City of Mount Vernon*, 118 F.3d 92, 98 (2d Cir.1997) (citation and internal quotations omitted), *cert. denied, City of Mount Vernon v. Stone*, —— U.S., ——, 118 S.Ct., 1044, 140 L.Ed.2d 109 (1998). Since the "benefits" mentioned do not refer to the benefits to the employer, *Borkowski*, 63 F.3d at 138, n. 3., it is not clear how such benefits are calculated. In *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538 (7th Cir.1995), Judge Posner suggested that the relevant benefit is the benefit to society in avoiding the handicapped person's " 'dependancy and nonproductivity.' " *Id.*, 44 F.3d at 543 (quoting 42 U.S.C. § 12101(a)(9)). However, at least one judge of the Second Circuit found this conclusion "not beyond dispute" and considered that the ADA may require accommodation even in cases where the costs were greater than the afore-mentioned societal benefits. *Borkowski*, 63 F.3d at 146, n. 2 (Newman, J., concurring). In any event, the plaintiff having made this facial showing of reasonableness, the distinction between the "reasonableness" limit and the "undue hardship" limit apparently disappears: the burden shifts to the defendant to demonstrate that the accommodation is unreasonable or that it imposes an "undue hardship" which "in practice" will "amount to the same thing." *Stone, id.* (citations and internal quotations omitted).

scope and duration, "was limited to those cases in which constitutional violations were most likely." *Id.* The Court stated that "[w]here ... a congressional enactment pervasively prohibits constitutional state action in an effort to remedy unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Id.*, 521 U.S. at ——, 117 S.Ct. at 2170–71. *See also Baker v. Pataki*, 85 F.3d 919, 928 (2d Cir.1996) (Mahony, J., joined by Miner, J., Walker, J., McLaughlin, J. and Jacobs, J.) (finding that a measure prohibiting voting practices which have a racially disparate impact had been upheld because it was " 'aimed at areas where voting discrimination had been most flagrant.' ") (quoting *South Carolina,* 383 U.S. at 315, 86 S.Ct. 803). ·

Because the ADA's reasonable accommodation requirement mandates accommodations of significant cost when only cases of minor cost are arguably likely to be unconstitutional, the reasonable accommodation requirement, like RFRA, is at best "an unwarranted response to another, lesser harm," *Boerne, id.,* and thus an invalid Fourteenth Amendment enforcement measure.

### b) Evidence that failure to accommodate is motivated by prejudice

Courts which have found the ADA to be valid Fourteenth enforcement legislation have frequently relied on the fact that Congress made factual findings, present both in the text of the ADA and its legislative history, which established the presence in society of irrational discrimination against the disabled. *See Kimel,* 139 F.3d at 1442–43 (Hatchett, C.J., concurring with regard to validity of ADA) (noting findings); *Coolbaugh,* 136 F.3d at 436–37 (same); *Lamb,* 19 F.Supp.2d at 506 (same).

Congress' findings regarding the presence of purposeful discrimination against the disabled are insufficient to support the validity of the accommodation requirement for two reasons. First, evidence of an employer's subjective motivation is not relevant to determining the constitutionality of the employer's failure to accommodate—only the objective rationality of the decision is relevant. Second, even if findings of subjective motivation were relevant, neither the ADA's legislative record nor its statutory findings support the conclusion that the failure to accommodate is motivated by discrimination.

#### 1) Evidence of Subjective Intent is Not Relevant

 Legislative history and statutory findings are relevant if they demonstrate that a measure will prevent or remedy unconstitutional conduct. *See Boerne,* 521 U.S. at ——, 117 S.Ct. at 2168–69. However, the constitutionality of the failure to accommodate a disability depends only on whether such a decision is rationally related to the achievement of any conceivable legitimate government interest. If such a relation can be found, the actual motivations of the governmental body are "constitutionally irrelevant ...." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 318, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also Haves v. City of Miami,* 52 F.3d 918, 922 (11th Cir.1995) (" 'The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body.' ") (quoting *Panama City Medical Diagnostic Ltd. v. Williams,* 13 F.3d 1541, 1546 (11th Cir.1994)). Evidence regarding the employer's subjective intent in failing to accommodate would therefore not serve to demonstrate that such failures were unconstitutional. Hence, it would not provide any support for the conclusion that the accommodation requirement is a "congruent and proportional response" to a constitutional injury.

#### 2) Actual Findings Do Not Support Conclusion That Refusal To Accommodate Motivated By Prejudice

Assuming that evidence of actual motivation were relevant, the ADA's legislative history and statutory findings do not establish that employers who do not make accommodations are motivated by irrational discrimination. Indeed, far from supporting the conclusion that the lack of accommodation of the disabled reflects prejudice, the legislative history supports the opposite conclusion that the accommodation requirement was directed

at inherently discriminatory effects, not purposeful discrimination.

In *Alexander v. Choate,* 469 U.S. 287, 298, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court, looking at the legislative history of § 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, found that the Act's prohibition of discrimination against the disabled had to encompass the failure to make reasonable accommodations *in addition to* prohibiting purposeful discrimination precisely because Congress had found that governmental decisions having a disparate impact on the disabled were *not* usually motivated by discriminatory intent:

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. Thus, Representative Vanik, introducing the predecessor to § 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live amount society "shunted aside, hidden, and ignored." 117 Cong. Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America .... " 118 Cong. Rec. 525–526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted § 504, described the Act as a response to "previous societal neglect." 119 Cong. Rec. 5880, 5883 (1973). See also 118 Cong. Rec. 526 (1972) (statement of co-sponsor Sen. Percy) (describing the legislation leading to the 1973 Act as a national commitment to eliminate the "glaring neglect" of the handicapped). Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.
>
> [Further,] much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult in not impossible to reach were the Act construed to proscribe only conduct fueled by a dis-

criminatory intent. For example, elimination of architectural barriers was one of the central aims of the Act, see, *e.g.,* S.Rep. No. 93–318, p. 4 (1973), U.S.Code Cong. & Admin. News 1973, pp.2076, 2080, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped....

*Id.* at 295–297, 105 S.Ct. 712.

The House Report for the ADA explicitly adopted the analysis of *Alexander* and defended the need to address disparate impact conduct because of the need to " 'rectify the harms resulting from action that discriminat[ed] *by effect as well as by design.'* " H.R.Rep. No. 101–485(II), at 61 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 343 (quoting *Alexander,* 469 U.S. at 297, 105 S.Ct. 712) (emphasis added). Thus, as with RFRA, "Congress' concern was with the incidental burdens imposed, not the object or purpose of the" failure to accommodate. *Boerne,* 521 U.S. at ——, 117 S.Ct. at 2169.

The ADA's statutory findings argue for the same conclusion. In the findings, Congress distinguished between intentional discrimination and the discriminatory *effects* of the failure to accommodate:

> individuals with disabilities continually encounter various forms of discrimination, including outright exclusion, the discriminatory effects of architectural, transportation, and communications barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices ....

42 U.S.C. § 12101(5) (1994). The distinction appears again in paragraph 7, which states:

> individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society ....

42 U.S.C. § 12101(7) (1994). The Court concludes that, even if actual motivation were relevant in determining constitutional validity, the record argues against the conclusion that the failure to accommodate has been motivated by discrimination.

**152**

In conclusion, the ADA's broad imposition of a duty to accommodate any form of disability up to the point of undue hardship and without regard to whether there is evidence that the refusal to do so is irrational or motivated by purposeful discrimination renders it more analogous to RFRA than to the Voting Rights Act. *Cf. McGregor v. Goord,* 18 F.Supp.2d 204, 209 (N.D.N.Y.1998) (finding that employee-leave entitlement granted by the Family and Medical Leave Act was incongruent with the Equal Protection Clause because it was imposed without regard to whether the failure to grant such leave was in fact a product of sexual discrimination). The Court finds that the accommodation requirement, and thus the employment anti-discrimination provision which contains it, is an invalid exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment. Therefore, the second requirement for abrogation of Eleventh Amendment immunity has not been satisfied, and the present action must be dismissed for lack of subject matter jurisdiction.

Accordingly, it is hereby

ORDERED that Defendant's motion for summary judgment is GRANTED and the action is DISMISSED in its entirety for lack of subject matter jurisdiction; and it is further

ORDERED that Plaintiff's motion for partial summary judgment is DENIED; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.